# United States Court of Appeals for the Federal Circuit

2007-5142


STOCKTON EAST WATER DISTRICT, and
CENTRAL SAN JOAQUIN WATER CONSERVATION DISTRICT,

Plaintiffs-Appellants,

and

SAN JOAQUIN COUNTY, STOCKTON CITY,
and CALIFORNIA WATER SERVICE COMPANY,

Plaintiffs,

v.

UNITED STATES,

Defendant-Appellee.


Jennifer L. Spaletta, Herum Crabtree Brown, of Stockton, California, argued for plaintiffs-appellants. With her on the brief were Jeanne M. Zolezzi and Natalie M. Weber. Of counsel on the brief were Roger J. Marzulla, Nancie E. Marzulla and Gregory T. Jaeger, Mazulla & Marzulla, of Washington, DC.

Kathryn E. Kovacs, Attorney, Appellate Section, Environment & Natural Resources Division, United States Department of Justice, of Washington, DC, argued for defendant-appellee. With her on the brief were Ronald J. Tenpas, Assistant Attorney General, and Katherine J. Barton, Attorney. Of counsel was Kristine S. Tardiff, Attorney, of Concord, New Hampshire.

John D. Echeverria, Georgetown Environmental Law & Policy Institute, of Washington, DC, for amicus curiae. Of counsel on the brief was Katherine S. Poole, Natural Resources Defense Council, of Washington, DC.

Appealed from: United States Court of Federal Claims

Judge Christine O.C. Miller

# United States Court of Appeals for the Federal Circuit

2007-5142

STOCKTON EAST WATER DISTRICT, and
CENTRAL SAN JOAQUIN WATER CONSERVATION DISTRICT,

Plaintiffs-Appellants,

and

SAN JOAQUIN COUNTY, STOCKTON CITY,
and CALIFORNIA WATER SERVICE COMPANY,

Plaintiffs,

v.

UNITED STATES,

Defendant-Appellee.

Appeal from the United States Court of Federal Claims in 04-CV-541,
Judge Christine O.C. Miller.

_____

DECIDED:  September 30, 2009
_____

Before NEWMAN, PLAGER, and GAJARSA, Circuit Judges.

Opinion for the court filed by Circuit Judge PLAGER.  Circuit Judge GAJARSA dissents.

PLAGER, Circuit Judge.

In the history of the western United States, the fight for water rights is a central theme.  California, because a goodly part of the state shares the desert-like conditions that lie at the root of the fight, since before its founding has been one of the locales for

this battle. This case is another chapter in that state's long-running history of water disputes.[1]

Plaintiffs Stockton East Water District ("Stockton East") and Central San Joaquin Water Conservation District ("Central") (collectively, "plaintiffs" or "the Districts") are water agencies organized under the laws of California for the purpose of providing water to municipal, industrial, and agricultural users.[2] They allege that the United States (sometimes "Federal Government" or just "Government") in managing water resources in California that are under federal control has failed to provide the quantities of water that it agreed to make available. The agencies claim to have binding contracts for the water, and that the Federal Government has breached these contracts.

The water at issue is from the New Melones Unit of the vast federal water resources project in California known as the Central Valley Project ("CVP" or "Project"). The Project and the water resource facilities contained in it are situated wholly within the state of California, but are owned and operated by the United States through its Bureau of Reclamation ("Reclamation"), a part of the Department of the Interior.

When Reclamation would not meet the quantity commitments in their contracts because of other demands for the water to which Reclamation gave priority, plaintiffs sued the United States in federal district court. That was in 1993, and marked the beginning of this continuing saga that has yet to see its end.

---

[1] For another glimpse at the current battles, see Jim Carlton, Parched State Searches for Ways to Expand Water Supply, Wall St. J., July 9, 2009, at A4; Sabrina Shankman, California Gives Desalination Plants a Fresh Look, Wall St. J., July 9, 2009, at A4.

[2] Other plaintiffs, not parties to the contracts in this case, sought third-party beneficiary status. They have not appealed the trial court's ruling against them on that issue.

In 2007, the suit, having been transferred earlier by the district court to the United States Court of Federal Claims, was decided by that court after an eight-day trial. Subsequently, in an exhaustive 85-page opinion, the Court of Federal Claims concluded that, though the obligations for water delivery were indeed breached, certain contract provisions gave the Government the defenses it claimed. Judgment was awarded to the Government. Plaintiffs timely appealed to this court.

BACKGROUND

The historical record and procedural history of this case occupy a substantial part of the trial court's extensive opinion. See Stockton E. Water Dist. v. United States, 75 Fed. Cl. 321, 330-47 (2007). For more of the details, we refer the reader there. We recite in only summary fashion the facts necessary to place our decision in context.

*A. The Central Valley Project, New Melones, and the 1983 Contracts*

The Central Valley Project is the largest federal water management project in the United States. It was built to serve the water needs in California's Central Valley Basin. Originally conceived by the State of California, the CVP was taken over by the Federal Government in 1935 and initially funded by Congress as part of the nation's effort to use public works projects to return the economy to health during the Depression.[3] Congress reauthorized the CVP in 1937, assigning to the Bureau of Reclamation the tasks of constructing and operating the CVP.[4] The CVP today consists of twenty dams and reservoirs, eleven power plants, over 500 miles of major canals, and numerous

---

[3] Rivers and Harbors Act of 1935, Pub. L. No. 74-409, 49 Stat. 1028; Emergency Relief Appropriation Act of 1935, Pub. L. No. 74-11, 49 Stat. 115.

[4] Rivers and Harbors Act of 1937, Pub. L. No. 75-392, § 2, 50 Stat. 844, 850.

other facilities.[5]  Reclamation continues to operate the CVP under the various federal reclamation laws that have been amended and supplemented many times over the years.

The New Melones Unit of the CVP was completed in 1979 and consists of a large concrete dam on the Stanislaus River and a reservoir with a storage capacity of 2.4 million acre-feet of water.[6]  New Melones was the last unit of the CVP to be constructed, after final authorization by Congress in 1962.[7]  As Reclamation's history of the project explains,[8] the construction of the New Melones dam and power plant was one of the more controversial chapters in the history of the CVP.  The controversy focused on the loss of a popular stretch of recreational white water, inundation of archeological sites, and flooding of the West's deepest limestone canyon.  Controversy over the project lasted over a decade before the decision to proceed and provide irrigation water, flood control, and power generation occurred.  The battle over construction of New Melones portended the end of the era of large dam construction.

The 1962 Act authorizing New Melones required among other things that Reclamation determine the quantity of water required to satisfy all existing and

---

[5]     About the Central Valley Project, http://www.usbr.gov/mp/cvp/about.html (last visited Sept. 29, 2009).

[6]     An acre-foot is the volume of water necessary to cover one acre of land with water to a depth of one foot and is equal to approximately 325,580 U.S. gallons. When gallons are too cumbersome a measure, the acre-foot is the standard unit of water used in this country in reference to large-scale water resources.

[7]     Flood Control Act of 1962, Pub. L. No. 87-874, 76 Stat. 1173, 1191. Congress had earlier authorized a New Melones project to alleviate flooding problems. Flood Control Act of 1944, Pub. L. No. 78-534, 58 Stat. 887, 901.  The 1962 Act authorized the expansion of New Melones and its operation as part of the CVP.

[8]     http://www.usbr.gov/projects/ (select "New Melones Unit Project"; then follow "Project History" hyperlink) (last visited Sept. 29, 2009).

anticipated future needs within the Stanislaus River Basin.[9] Also, as with every federal reclamation project, Reclamation was obligated to comply with state law in appropriating water for New Melones.[10] This required Reclamation to apply for permits from the California State Water Resources Control Board ("SWRCB"), which has the power to make decisions for the state regarding water appropriation.

In 1973, the SWRCB initially approved Reclamation's application for a permit to appropriate water from New Melones, subject to twenty-five conditions and limitations.[11] Among other things, the SWRCB mandated annual releases from New Melones of 98,000 acre-feet for fishery and wildlife purposes. The SWRCB also established water quality standards and estimated that annual releases of up to 70,000 acre-feet would be necessary to meet those standards. Taking into account these state-imposed requirements, Reclamation prepared a plan for operation of New Melones. As detailed in a 1980 report, Reclamation estimated that 180,000 acre-feet of water would be available annually for agricultural and municipal and industrial uses after other anticipated needs, including state-mandated releases for fishery and wildlife purposes and water quality, were satisfied.[12]

Another condition attached to the SWRCB's approval of Reclamation's application prohibited full impoundment of water in the reservoir until Reclamation had firm commitments for the beneficial use of the water. In part to demonstrate such

---

[9] 76 Stat. at 1191.

[10] See Reclamation Act of 1902, Pub. L. No. 57-161, § 8, 32 Stat. 388, 390 (codified at 43 U.S.C. § 383); see also California v. United States, 438 U.S. 645, 652 (1978).

[11] California State Water Resources Control Board, Decision 1422 (Apr. 14, 1973).

[12] J.A. at 2977 (Stanislaus River Basin Alternatives and Water Allocation Special Report (1980)).

commitments, Reclamation began contract negotiations in the early 1980s with Stockton East and Central to provide the Districts with water from New Melones. These negotiations culminated in the signing by Reclamation of nearly identical contracts with Stockton East and Central ("the 1983 contracts"). These are the contracts at issue in this case.

Article 3 of each contract specifies the *maximum* amount of water to be made available annually from the New Melones reservoir—75,000 acre-feet for Stockton East and 80,000 acre-feet for Central. Thus, Reclamation committed to provide the Districts with up to 155,000 acre-feet out of the 180,000 acre-feet per year that the 1980 report estimated would be available for consumptive uses. Article 3 also establishes for each year of the contract a *minimum* amount of water that Reclamation is obligated to make available, and for which the Districts must pay, beginning with the first full year after notification by Reclamation that water is available to the Districts.

As required by the 1983 contracts, the Districts constructed and installed at their own expense multi-million dollar water delivery systems to carry water from the New Melones reservoir to their facilities. In May 1988, Reclamation announced that water was available and that the initial delivery date for purposes of the contracts was January 1, 1989. This triggered the start of the annual minimum purchase and supply schedule of Article 3; however, from 1989 through 1992, the first four years after the initial delivery announcement, the Districts did not request any water from New Melones, and no water was delivered to them.

*B. The Central Valley Project Improvement Act*

In 1992, before the Districts ever received water from New Melones under the 1983 contracts, Congress enacted the Central Valley Project Improvement Act ("CVPIA").[13]  The purposes of the Act include the following:

> (a)  to protect, restore, and enhance fish, wildlife, and associated habitats in the Central Valley and Trinity River basins of California;
>
> (b)  to address impacts of the Central Valley Project on fish, wildlife and associated habitats;
> . . . .
> (f)  to achieve a reasonable balance among competing demands for use of Central Valley Project water, including the requirements of fish and wildlife, agricultural, municipal and industrial and power contractors.[14]

The CVPIA expressly required the release of substantial quantities of water for fish, wildlife, and habitat restoration needs, directing Reclamation to dedicate annually 800,000 acre-feet of the total CVP yield to those purposes.[15]   This legislation significantly affected Reclamation's operation of the CVP.  Though no provision of the CVPIA was directed specifically at the operation of the New Melones Unit, as will be discussed below Reclamation's decisions regarding implementation of the CVPIA impacted the amount of water made available from New Melones for consumptive uses.

*C. Contract Performance — 1993-2004*

The first year the Districts requested water under the contracts was 1993, the fifth year after the initial delivery date announced by Reclamation, and the year immediately following enactment of the CVPIA.  The following chart from the trial court's

---

13    Pub. L. No. 102-575, §§ 3401-12, 106 Stat. 4600, 4706-31 (1992).
14    CVPIA § 3402, 106 Stat. at 4706.
15    CVPIA § 3406(b)(2), 106 Stat. at 4715-16.

opinion, referred to by the trial court as the "Build-Up Schedule,"[16] shows the annual minimum quantities of water in acre-feet that Reclamation was obligated under the contracts to make available to Stockton East and Central from 1993 through 2004, the last year at issue in this case:

**Annual Minimum Obligations**

| Year | Stockton East | Central |
|------|---------------|---------|
| 1993 | 500 | 0 |
| 1994 | 23,350 | 28,000 |
| 1995 | 23,450 | 28,000 |
| 1996 | 23,550 | 28,000 |
| 1997 | 46,400 | 56,000 |
| 1998 | 46,500 | 56,000 |
| 1999 | 66,700 | 56,000 |
| 2000 | 67,400 | 56,000 |
| 2001 | 68,100 | 56,000 |
| 2002 | 68,800 | 56,000 |
| 2003 | 69,500 | 56,000 |
| 2004 | 70,200 | 56,000 |

Under Article 4 of the contracts, the Districts were required to submit annual schedules indicating their monthly water requirements. Initially the Districts submitted such schedules, but it soon became apparent that Reclamation did not intend to provide the requested water, so according to the Districts they eventually stopped submitting schedules, or else requested less water than they actually desired. The trial court found

---

[16]     Stockton, 75 Fed. Cl. at 365.

that failure by the Districts to submit schedules did not excuse any breach of contract by Reclamation;[17] that finding is not disputed.

Following is a synopsis of the Districts' requests for water and the amount of water delivered by Reclamation under the 1983 contracts during the years 1993-2004. As will be seen, for most of the years at issue the water received by the Districts fell far short of the amounts requested and the minimum amounts required by Article 3 of the contracts.

<u>1993</u>

Although the Districts requested a total of 20,000 acre-feet for 1993, Reclamation delivered no water under the contracts that year.

<u>1994</u>

For 1994, Stockton East requested 75,000 acre-feet of water and Central requested 25,000 acre-feet. In February of that year, Reclamation announced an initial forecast of available CVP water based on "conditions caused by California's fourth driest year in 85 years . . . result[ing] in Reclamation forecasting a critically dry year for 1994."[18] The initial forecast provided a "zero water supply" for the Districts from New Melones, stating that "every effort is needed to avoid allowing the level of New Melones reservoir to drop below the minimum storage level (300,000 acre-feet) needed to generate power. . . . The available water will be allocated to fish and wildlife, and to meet water quality requirements."[19] In May 1994, Reclamation responded to the Districts' water requests with a letter stating that no water could be delivered because

---

[17]     Id. at 363.
[18]     J.A. at 3962 (Def.'s Ex. 276).
[19]     Id. at 3963.

rain and snowfall conditions had not been sufficient to support CVP contract deliveries. In the letter, Reclamation explicitly invoked the shortage provision of Article 9 of the 1983 contracts (which will be discussed in more detail later):

> The shortage provision in your contract provides for the apportionment of CVP water among users from the same source when there is a shortage in the quantity of water available to CVP contractors. In accordance with that authority, the United States hereby informs you that there will be no available water supply from New Melones Reservoir for meeting your contractual commitments for the 1994 water year.[20]

Neither Stockton East nor Central received any water from New Melones in 1994.

### 1995

For 1995, Stockton East requested 65,000 acre-feet of water and Central requested 50,000 acre-feet. In April 1995, Reclamation announced that a total of 37,000 acre-feet would be made available to the Districts. Water delivery was delayed, however, when Reclamation informed the Districts that their water conservation plans, which were required by the contract and had been submitted two years earlier, did not meet Reclamation's criteria. After the Districts' revised water conservation plans were approved in August 1995, Central requested delivery of 5,000 acre-feet and Stockton East requested delivery of 6,750 acre-feet for the remainder of 1995. Ultimately Reclamation delivered in 1995 only 4,003 acre-feet to Stockton East and 4,564 acre-feet to Central.

### 1996

For 1996, Stockton East requested 32,400 acre-feet and Central requested 40,000 acre-feet. Stockton East later reduced its requested amount significantly.

---

[20]    J.A. at 3384 (Pls.' Ex. 99).

Reclamation delivered 15,197 acre-feet to Stockton East and 17,508 acre-feet to Central.

### 1997-98

Reclamation, the United States Fish and Wildlife Service ("FWS"), the Districts, and other interested parties undertook negotiation of an Interim Plan of Operations ("IPO"). Completed and agreed to by the parties in 1997, the IPO provided a computational mechanism for allocating water to the Districts based on annual storage and inflow forecasts at the New Melones Reservoir. The amount to be allocated annually to the Districts combined ranged from 0 to 90,000 acre-feet. The trial court found that the Districts agreed to the terms of the IPO as a short-term modification to the 1983 contracts for 1997 and 1998.[21] Under the IPO, the Districts were allocated a combined total of 50,000 acre-feet for each of those years; the trial court found that Reclamation's water deliveries in those years complied with the terms of the IPO.

### 1999-2004

Although the IPO was designed for use in 1997 and 1998, Reclamation continued to use the formulas in the IPO to allocate water to the Districts for each year from 1999 to 2004. The following table, adapted from the trial court's opinion, summarizes (in acre-feet) the water requested by the Districts, the allocations made by Reclamation using the IPO, and the water actually delivered to each District between 1999 and 2004:

---

[21]     Stockton, 75 Fed. Cl. at 356.

| Year | Requested by Stockton East | Requested by Central | Allocated (Total) | Delivered to Stockton East | Delivered to Central |
|---|---|---|---|---|---|
| 1999 | 23,000 | None | 60,000 | 31,112 | 33,786 |
| 2000 | 24,000 | None | 90,000 | 7,377 | 27,759 |
| 2001 | 24,000 | None | 34,000 | 7,030 | 25,747 |
| 2002 | 3,500 | 12,000 | 15,500 | 3,493 | 10,508 |
| 2003 | 10,000 (combined with Central) | 10,000 (combined with Stockton East) | 10,000 | 2,210 | 9,846 |
| 2004 | None | 25,000 | 15,000 (Central only) | 1,486 | 13,605 |

## D. Procedural History

As noted, this case began in 1993 with a complaint filed in the United States District Court for the Eastern District of California. Plaintiffs' 1993 complaint alleged, inter alia, that implementation of the CVPIA caused the impairment of their vested water rights under the contracts in violation of the Fifth Amendment takings clause.

Some ten years later, the district court transferred the takings cause of action to the Court of Federal Claims. Soon thereafter, plaintiffs, now in the Court of Federal Claims, amended their complaint to include a breach of contract claim for failure to provide water from 1993 to 2004 in accordance with the 1983 contracts. In 2005, the parties filed cross-motions for summary judgment on liability for the breach of contract claim. The trial court denied both motions and set the contract issues for trial. Stockton E. Water Dist. v. United States, 70 Fed. Cl. 515 (2006).

Following an eight-day trial in 2006, the trial court issued its extensive opinion, in which it detailed the facts and set out various findings and conclusions. The court found

that in each year from 1993 to 2004, Reclamation breached the 1983 contracts by not making available the amounts of water in the annual minimum purchase and supply schedule of Article 3. The court concluded, however, that Reclamation's failure to deliver the required water was excused because Reclamation validly invoked the shortage provision of Article 9 and its determinations were not arbitrary, capricious, or unreasonable in violation of Article 12(d) (both sections to be discussed below). Stockton, 75 Fed. Cl. at 363-66. The court rejected the Government's alternative defense that liability would be precluded by the sovereign acts doctrine. Id. at 372-73. Finally, although the takings claim was stayed pending resolution of the contract claim and was not at issue at trial, id. at 324 n.2, the trial court nevertheless dismissed the takings claim, concluding that the appropriate remedy for plaintiffs' claims arises from the contracts themselves rather than the constitutional protection of property rights. Id. at 373-74.

Subsequently, the trial court granted in part and denied in part the Districts' motion to alter or amend the judgment. The court corrected several factual errors in its earlier opinion, but refused to delete the portion of the opinion that dismissed the takings claim. Stockton E. Water Dist. v. United States, 76 Fed. Cl. 470 (2007). The trial court also denied the Districts' motion for reconsideration. Stockton E. Water Dist. v. United States, 76 Fed. Cl. 497 (2007).

The Districts filed a timely appeal in which they challenge the trial court's non-liability judgment for 1994, 1995, and 1999-2004. They also appeal the trial court's dismissal of their takings claim. We have jurisdiction under 28 U.S.C. § 1295(a)(3).

DISCUSSION

The history of this litigation is long, the facts are complex, as the above condensation and the trial court's more extensive opinion testify, and the determinative legal issues, at least if one accepts the parties' views, are several, and are strongly disputed. Even so, the basic case is fairly straightforward and the legal issues are not that difficult to follow. We will begin with a capsule restatement of the causes of the dispute, and how the issues became framed. This will simplify the problem of explaining exactly what has to be decided, and how we have decided it.

*A. Overview: The CVP and Changing Priorities*

When the CVP was begun in the 1930s, the stated purposes of the Project were "improving navigation, regulating the flow of the San Joaquin River and the Sacramento River, controlling floods, providing for storage and for the delivery of the stored waters thereof, for the reclamation of arid and semiarid lands and lands of Indian reservations, and other beneficial uses, and for the generation and sale of electric energy . . . ."[22] The dams and reservoirs were to be used "first, for river regulation, improvement of navigation, and flood control; second, for irrigation and domestic uses; and third, for power."[23]

As earlier noted, under the terms of the Congressional enactments establishing the CVP, the Federal Government in building and administering the Project was to be subject to the same state rules that applied to other water users in California. That

---

[22] Rivers and Harbors Act of 1937, Pub. L. No. 75-392, § 2, 50 Stat. 844, 850.

[23] Id.

meant complying with the State's regulations applicable to water users, particularly users who wished to capture the water for consumptive uses.

A brief refresher of key terms may be helpful. "Consumptive uses" refers to uses, such as irrigation, domestic uses, and industrial processes, that involve withdrawals from the water source, a lake or stream or in this case a man-made reservoir. These withdrawals may result in diminished quantity and quality of water available to downstream users for their consumptive uses, and may significantly impair such "non-consumptive uses" as boating, fishing, and wildlife habitat.

In the arid western states, development depended on assured supplies of scarce fresh water for consumptive use. In contrast to the "riparian rights" regime in the Eastern United States,[24] where water was abundant, the legal regime that developed for Western water rights is called "prior appropriation."[25] As a general proposition, under prior appropriation doctrine the right to a consumptive use of water belongs to the first person to make beneficial use of it. That person becomes the owner of a right to the quantity of water put to beneficial use, and that right takes priority over later claimants to the water.[26]

For purposes of this case, the important point is that when the CVP was established and for many years after, both federal and state water law and policy gave

---

[24] The "riparian rights" system for water allocation attributed water rights to land adjacent to surface water sources. The legal measure of the right was reasonable use. Ground water was freely accessed and belonged to the owner of the overlying land. See generally F.E. Maloney, S.J. Plager & F.N. Baldwin, Jr., Water Law and Administration ch.2 (1968).

[25] See generally 2 Waters and Water Rights chs.11-12 (Robert E. Beck ed., repl. vol. 2008). California, because it has riparian-type geography as well as arid regions, has some of both of these water rights regimes. 1 Waters and Water Rights § 8.02(a) (Robert E. Beck ed., repl. vol. 2007).

[26] 2 Waters and Water Rights § 12.01 (Robert E. Beck ed., repl. vol. 2008).

high priority to making the water resources available for consumptive uses. This meant providing water for irrigation, which created the fertile fields of California's central valley agricultural industry, and later for withdrawals for domestic and industrial uses in support of the state's burgeoning population and its cities. That was still the state of affairs when the New Melones project was undertaken in 1962, and this focus on consumptive uses was reflected in the 1983 contracts between the Districts and Reclamation governing consumptive use of the water in the New Melones reservoir.

However, by the late 1980s and early 1990s, as environmental concerns became more pronounced and fish and wildlife interests moved more to the forefront, Government policy began to shift. For example, in 1973 when the SWRCB initially approved Reclamation's permit for New Melones, it required 98,000 acre-feet of water to be released annually for fish and wildlife. However, under a 1987 agreement entered into by Reclamation and the California Department of Fish and Game, Reclamation was required to release for the same purpose up to 302,100 acre-feet of water annually. At the same time, while Reclamation anticipated when it signed the 1983 contracts that water quality standards mandated by the state would be attained with annual releases of 70,000 acre-feet from New Melones, significantly greater releases were necessary in later years to meet the standards.

At the federal level, the shift in policy culminated in the Congressional enactment in 1992 of the CVPIA. The legislation added "mitigation, protection, and restoration of fish and wildlife" to the purposes of the CVP[27] and for the first time under federal law specified that substantial quantities of water from the CVP were to be dedicated

---

[27]     CVPIA § 3406(a)(1), 106 Stat. at 4714.

annually to non-consumptive uses—fish, wildlife, and habitat restoration.[28] Furthermore, and significantly, the Act expressly altered the priorities for use of the CVP dams and reservoirs to now include fish and wildlife, adding the italicized phrases: "first, for river regulation, improvement of navigation, and flood control; second, for irrigation and domestic uses *and fish and wildlife mitigation, protection and restoration purposes*; and third, for power *and fish and wildlife enhancement*."[29]

As the trial court found, "the ever-increasing imposition of additional obligations for salinity and fisheries water releases led to a clash of management objectives and priorities, the unpredictability of available water supply, and an inherent conflict between demands for consumptive use by plaintiffs and environmental concerns." Stockton, 75 Fed. Cl. at 338. Ultimately the changing priorities "required Reclamation to alter the manner in which it made operational decisions regarding the allocation of water to the Contracting Parties pursuant to the 1983 Contracts." Id. at 338-39.

Reclamation's own website sums it up by noting that the New Melones Dam is a reminder of the conflicts surrounding growth, the environment, and water in the West: "Even without the environmental controversy that surrounds the project, the operational and water yield problems will certainly cause continued difficulties well into the future. With the enormity of the problems facing New Melones, it seems unlikely that the project will ever realize its full potential as a multi use unit. Indeed, New Melones may become a case study of all that can go wrong with a project."[30]

---

[28] CVPIA § 3406(b)(2), 106 Stat. at 4715.
[29] CVPIA § 3406(a)(2), 106 Stat. at 4714 (emphasis added).
[30] http://www.usbr.gov/projects/ (select "New Melones Unit Project"; then follow "Project History" hyperlink) (last visited Sept. 29, 2009).

*B. Contract Interpretation and Performance*

The record establishes and the trial court found as a fact that Reclamation failed to provide the water that was promised under the 1983 contracts for the years 1994, 1995, and 1999-2004, the years at issue in this appeal. Absent an affirmative defense, that failure by the Government would constitute a breach of the contracts and render the Government liable for damages for the breach.

The Government essentially raises three affirmative defenses to this breach of contract suit. First, the contracts were entered into in light of federal reclamation law and state permits, and any changes in law, even changes such as the CVPIA made years after the contracts were entered into, are incorporated as a matter of fundamental law into the contracts. This will be referred to as the 'inherency' defense. Second, specific provisions of the contracts, namely Articles 9(a) and 12(d), provide the Government with a valid defense. This is the 'contract provision' defense. And third, in addition to these other defenses, the sovereign acts doctrine stands as a defense to the Districts' contract claims; this we call the 'sovereign acts' defense. We address each of these defenses in turn.

1. The Inherency Defense: Are the contracts by their inherent nature subject to changes in the law?

The Government's argument is that, because these contracts involve the administration of a government program by a government agency, and the administration of that program is subject to later changes in federal and, in this case state, law and policy, the contracts are effectively adhesion contracts. That is, whatever changes may occur in the Government's law and policies with regard to the contract, for example, the CVPIA and Reclamation's administration of it, the Districts must adhere to

them. The Government finds as the source of this doctrine the basic nature of contracts with a sovereign United States, and also cites as authority the basic principles of California water law, including the public trust doctrine, which the Government refers to as 'background principles.' The Districts dispute that the CVPIA is relevant to the proper administration of the contracts. They further dispute that the so-called 'background principles' of California statutory and common law have any bearing on the question of obligations under these supply contracts with regard to the specified quantities of water within the control of the Government.

We note here that this defense shares in some respects the conceptual underpinnings of the sovereign acts defense, a matter we take up below. Because the Government raised this first defense separate and apart from that of the sovereign acts defense, we address it separately.

### a. Federal Law

We have no problem rejecting the Government's argument insofar as it pertains to changes in federal law. First, there is the obvious question of whether making the contracts subject to whatever future federal law or policy may hold would make the contracts illusory. Torncello v. United States, 681 F.2d 756, 760 (Ct. Cl. 1982) ("[A] party may not reserve to itself a method of unlimited exculpation without rendering its promises illusory and the contract void . . . ."); 1 Richard A. Lord, Williston on Contracts § 4.27 (4th ed. 1999) ("[W]here the promisor retains an unlimited right to decide later the nature or extent of his or her performance[, the] unlimited choice in effect destroys the promise and makes it illusory."). Relatedly, there is the question whether such a construction would also make the Government subject to a claim of unfair dealing and

fraud in inducing a party to enter into such a contract and expend substantial sums in compliance with it.

But more to the point in this case, there is nothing in these contracts to suggest that the Government's reading of the contracts and the claim of inherent law incorporated into them is what either party to the contracts understood was intended. Indeed, the contract provisions suggest quite the contrary. Specific provisions in the contracts afford the Government complete defenses to a failure to perform, but the defenses are circumscribed by the terms in which they are cast, so that the exculpatory provisions apply only in the specified circumstances. See 30 Richard A. Lord, Williston on Contracts § 77.38 (4th ed. 1999) ("The express terms of a contract can be pertinent evidence in undermining a supposed implied condition."). If the Government intended or expected to have unilateral control over its legal obligation to perform, control that could be exercised by the simple expedient of a change in its own law or policy, it hardly would need the protections that the provisions in the contracts afford.

### b. State Law

Changes in state law, however, present a somewhat different question. California is not a party to these contracts. A change in the applicable state law is not the same kind of unilateral action by a party to the contracts as when the change is made by the Federal Government. The issue about illusory contracts and misrepresentation is attenuated. Further, as noted earlier, the original legislation creating the CVP made the Federal Government's access to the Project's water subject to the State of California's laws and rules governing water rights. At the time the contracts were executed, Reclamation had complied with the state requirements then in

force and had obtained the necessary permits from the SWRCB. At that time, as far as the contracting parties were concerned, the Government could only expect to deliver the water that it controlled pursuant to state law, and the two state-created agencies that are the plaintiffs no doubt understood this.

The Government argues accordingly that the Districts' contract rights have always been subordinate to the requirements of state law as provided in the state permits for New Melones, including releases for senior water rights holders, water quality, and fishery. The Districts in fact do not contest that releases of water for these specified uses take priority over the Districts' contracts; the Districts so stipulated.[31]

The Government then argues that, as a consequence of these mandated releases, "in some years, the releases of water to satisfy state law utilized a large portion of the water available from New Melones Reservoir. . . . Thus, at least for some years, the Districts' concession that their contract rights are subordinate to Reclamation's obligation to satisfy state permit requirements *may* dispose of their entire claim."[32] The Districts respond that the Government did not produce actual evidence that operating New Melones in accordance with state law and pursuant to the state permits necessarily caused a shortage of water for consumptive uses in any given year. They cite as an example the year 1994, the only year at issue designated as a "critical" water year (see Annual New Melones Data, col.2, J.A. at 4976, a copy of which is appended to this opinion as Appendix A). In that year, releases from New Melones for senior water rights holders and to satisfy state permit requirements totaled some 700,000 acre-feet of water, and CVPIA releases totaled an additional 70,600. The

---

[31] Appellants' Br. 14.
[32] Appellee's Br. 19-20 (emphasis added).

Districts note that, even so, there remained some 425,000 acre-feet in storage at New Melones, and that it was within the discretion of Reclamation to allocate some water to the contracts, rather than, as was the case, provide none.

It is not clear from the Government's argument whether the state mandates that allegedly caused the shortages were mandates included in the original state permits, or were mandates that, like the CVPIA statute, were enacted after the contracts were in place. However, that may not matter to the Government's position. As we understand that position, changes in management practices, however mandated, were inherently the Government's right, and that, apparently, these changes need not be specifically justified by the particular circumstances.

In that the Government errs. A party to a contract generally has the option of performing or paying damages for non-performance. If the Government chooses to not perform but wishes to avoid having to pay damages, arguing that "the state made me do it," then the Government must prove it was the state mandates that caused the unavailability of water to meet the Government's contract obligations and not simply choices that the Government made.

There is no doubt that the State imposed substantial mandates for use of the water in the CVP, including New Melones, mandates to meet senior water rights and fish and wildlife needs and water quality concerns. Some of these mandates were built in to the permit that initially authorized the New Melones withdrawals, and some came later. The trial court in various parts of its opinion set out in extensive detail what these mandates were, and how they changed over the years at issue. See Stockton, 75 Fed. Cl. at 334 (senior water rights); id. at 335-36 (SWRCB requirements); id. at 336 (initial

fish and wildlife releases); id. at 337 (in-basin needs); id. at 339 (fishery releases); id. at 342 (salinity requirements at Vernalis).

However, what is missing from the record, from the Government's argument, and from the trial court's conclusions, is the necessary showing of a causal connection between the particular state mandates and Reclamation's inability to meet its obligations under the contracts. The Government did not establish nor did the trial court find the critical connection between the state law mandates, whatever they were, and the management practices of Reclamation that caused the shortages.

The Government was on notice that this question of causal connection was in contention. The Districts made it a point of their case at trial and again on appeal to us. They argued that there was insufficient evidence that the shortages in their contracts were caused by anything except unilateral decisions by Reclamation regarding how the available water was to be allocated, and that those decisions breached the contracts. If there was evidence that something other than Reclamation's decision making caused the breaches, the Government had fifteen years of litigation in which to make its case of record. It is a part of the Government's affirmative defense that state law and policy caused the shortages, rather than simply Federal management choices; the burden of persuasion resides with the Government.

### c. Burdens of Proof

With regard to this burden of persuasion and who has what, a considerable part of the trial court's opinion and the parties' briefs and arguments before this court were devoted to the question of who had what burden of proof, on this issue as well as

others.  Much of that discussion and argument about the issue is confused and difficult to follow.

The rules governing the allocation of the burdens of proof are straightforward. When dealing with burdens of proof it is essential to distinguish between two distinct burdens, the burden of persuasion and the burden of production (sometimes described as the burden of going forward).  Since this is a suit for breach of contract, it is elementary that the plaintiff Districts have the burden of persuasion on the issues of whether there is a contract, and whether that contract was breached by defendant United States.  23 Richard A. Lord, Williston on Contracts § 63:14 (4th ed. 1999) ("The plaintiff or party alleging the breach has the burden of proof on all of its breach of contract claims.").  Here, the record, the trial court's findings and conclusions, and the defendant's concessions, all support the determination that plaintiffs carried their burden on these issues.

Once the Government's breach of contract has been established, the Government is liable for the breach and ensuing damages, unless it can prove an affirmative defense of some kind that absolves it from that liability.  As explained earlier, the Government mounted three affirmative defenses.  For each of these defenses, the Government has the burden of persuasion; the plaintiff Districts have no burden to carry, beyond the burden of going forward with whatever efforts they may undertake to disprove the alleged defenses.  Id. ("Once the facts of breach are established, the defendant has the burden of pleading and proving any affirmative defense that legally excuses performance.").

After considering the evidence on both sides of the issue, the court must grant judgment for the plaintiff Districts with regard to each of the affirmative defenses for which the Government has failed to carry its burden of persuasion, applying the usual standards of proof for civil litigation. The proponent of the affirmative defense must prove all elements of the defense.[33]

On this record, we conclude that, since the Government has not carried its burden of proving its affirmative defense that the shortages were entirely or to some specified extent the result of state requirements for fishery and other such uses, the Government's defense on this point fails. Further, the Government's position is not helped by its invocation of 'background principles' of California water law. The issue here is not the fundamentals of rights vis-à-vis the United States and the State of California regarding its water, but the obligations, once the water is under the control of the United States, between Reclamation and the Districts pursuant to their contracts.

### 2. The Contract Provision Defense: Was the failure to perform excused by specific contract provisions?

The two contract provisions that lie at the heart of this Government defense are Articles 9 and 12. Article 9 of the Stockton East contract, entitled "Water Shortage and Apportionment," reads (with emphases added):

> 9.    (a) In its operation of the Project, the United States will use *all reasonable means* to guard against a condition of shortage in the quantity of water available to the Contractor pursuant to this contract. Nevertheless, *if a shortage does occur during any year because of drought, or other causes which, in the opinion of the Contracting Officer* [i.e., the Secretary of the Interior or his duly authorized representative], *are beyond the control of the United States, no liability shall accure* [sic]

---

[33]    For a further explication of burdens of proof, burden of persuasion, and the shifting burden of going forward, see the discussion in Technology Licensing Corp. v. Videotek, Inc., 545 F.3d 1316 (Fed. Cir. 2008).

*against the United States* or any of its officers, agents, or employees for any damage, direct or indirect, arising therefrom.

(b) In any year that the Contracting Officer determines that there is a shortage in the quantity of water available to customers of the United States from the New Melones Unit of the Project, the Contracting Officer will apportion available water among the water users capable of receiving water from said Unit, consistent with the existing contracts and Project authorizations. During such water short years, the quantity of water available to the Contractor pursuant to the terms of this contract shall be reduced, as necessary, to meet the full needs of the Basin contractors and the needs of Central San Joaquin Water Conservation District for its firm and interim water supply. . . .[34]

Article 12(d) governs determinations made by the parties under the contract:

Where the terms of this contract provide for action to be based upon the opinion or determination of either party to this contract, whether or not stated to be conclusive, said terms shall not be construed as permitting such action to be predicated upon arbitrary, capricious, or unreasonable opinions or determinations.

### a. Interpretation of the Applicable Articles

The Government points to the phrase in Article 9 that absolves the Government from liability "if a shortage does occur during any year because of drought, or other causes which, in the opinion of the Contracting Officer are beyond the control of the United States." The Government argues that this phrase has the effect of vesting in the contracting officer discretion over the determination of whether a shortage is beyond the Government's control. The Government further argues that, in any case, under Article 12 it is the plaintiffs who bear the burden of proving that the contracting officer's decision not to provide the contracted-for water was arbitrary, capricious, or unreasonable. According to the Government, the trial court did not err in holding that

---

[34] Article 9 of the Central contract is identical, except that the second sentence of section (b) ends after "Basin contractors." Thus, the needs of Central are to be satisfied before any water is delivered to Stockton East.

plaintiffs failed to carry their burden because Reclamation followed proper procedure in invoking the shortage provision in each of the affected years, including notifications to the parties.

The Districts respond that the provision in Article 9 is simply a typical *force majeure* provision, and that it applies only to drought and other 'acts of God.' And in any case, the burden of proof of whether the contracting officer correctly invoked the provision is on the Government whose defense it is, and not on the plaintiffs.

The Districts are correct. First, as previously discussed, the burden of proof—the burden of persuasion with regard to this defense—began with and remained with the Government. The procedural niceties followed by Reclamation and that preceded the Government's breach of contract do not change that.

Second, the plain meaning of the critical part of the phrase at issue, "because of drought, or other causes which . . . are *beyond the control* of the United States" on its face excludes anything that is *within the control* of the United States. Examples of causes beyond the control of the United States, in addition to a drought, might be earthquakes, sabotage (assuming the Government had taken proper precautions), an internal failure of the dam, and other such causes.

By contrast, changes in law, or changes in government policy, or changes in management practices brought about by the Government's changes in law or policy, are all causes within the control of the United States. The fact that certain changes in management of the New Melones unit by Reclamation were the result of mandates by Congress regarding the allocation between consumptive and non-consumptive uses of the water in the CVP—mandates that Reclamation may not have had a voice in—is

nonetheless a change within the control of the "United States," a term that of course includes Congress as well as the administering agency.

Indeed, it does not matter under this branch of the case if the federal change in management practice was in response to a change in allocation policy by the state, rather than a change mandated by the federal government itself. This is because a federal decision to adjust its management of the CVP to accommodate a change in state allocation policy is a policy decision determined by the Federal Government itself. Nothing in the contracts, in particular Article 9, as written absolves the Government from liability for the allocation decisions it makes unless they are caused by an event included within the scope of Article 9(a).

The interior clause, "in the opinion of the Contracting Officer," cannot change the intent or thrust of the governing phrase in Article 9(a). At most, it gives the Contracting Officer some leeway in assessing how much of a shortage condition may have resulted from actions within the Government's control and how much from causes beyond its control. At a minimum, under Article 12(d), it would be arbitrary and capricious on its face for the Contracting Officer to determine that a conscious change in allocation practice, made by Reclamation in response to a change in law or policy, is not within the control of the United States.

Is our reading of the plain meaning of this provision consistent with the intent of the parties at the time the contracts were executed, since contract interpretation is fundamentally a question of the contracting parties' intent? In this case we have the

testimony of both parties' representatives on this point, the officials who were responsible for the contracts.[35]

The General Manager of Stockton East and the General Counsel of Central both testified to the effect that Article 9(a) was understood at the time the contract was executed to provide for shortages caused by external circumstances, for example there could be a reduced amount of water in dry years or as a result of other physical problems, such as failure of the reservoir or earthquakes. Stockton, 75 Fed. Cl. at 357. The official who signed the 1983 contracts on behalf of Reclamation also testified. He responded to a direct question with regard to who bore the risk under Article 9 of future changes in the Reclamation law. He answered in the same vein: though Article 9 did not expressly allocate the risk, "'my expectation is that if you have a contract, the United States would live up to its contracts the same way any private party would . . . that everybody will honor their contracts.'" Id. at 358.

The trial court acknowledged the import of that testimony, but considered it trumped by the Ninth Circuit opinion in O'Neill v. United States, 50 F.3d 677 (9th Cir. 1995), a case on which the Government placed great weight. Stockton, 75 Fed. Cl. at 358-59. O'Neill dealt with rights under a similar contract, again involving use of water from the CVP. However, the exculpatory clause in that case—the clause equivalent to Article 9 here—was different in significant respects.

The language there was "in no event shall any liability accrue against the United States . . . for any damage . . . arising from a shortage on account of errors in operation,

---

[35] Ordinarily when a provision is found to have a plain meaning, that is deemed to conclusively establish the parties intent. McAbee Constr., Inc. v. United States, 97 F.3d 1431, 1435 (Fed. Cir. 1996). Here, because the trial court thought the provision ambiguous, the court took extensive testimony on the issue.

drought, or any other causes." <u>O'Neill</u>, 50 F.3d at 682 n.2. As plaintiffs note, that language is much broader—the examples offered are not limited to drought or similar causes, but include "operation [and] any other causes." Most significantly, there is no limitation to causes "beyond the control of the United States." Thus, even assuming the Ninth Circuit correctly held that that language makes unavailability of water resulting from the mandates of later legislation a shortage for which the United States is not liable, the <u>O'Neill</u> case is not persuasive in determining the meaning of the different language used in Article 9(a) of the Stockton East and Central contracts. And of course the facts of the Ninth Circuit case do not tell us anything about the express intent of the parties regarding the relevant contract provisions in this case.

With this understanding of the contract provisions, we are confronted with the key question that lies at the heart of Article 9(a)—during any of the years at issue in the case, were there circumstances of drought (or other cause within the proper meaning of Article 9(a)) that could excuse the Government's failure to provide the contracted-for quantities of water? As far as drought is concerned, the table of Annual New Melones Data for the years 1993 to 2004 (Appendix A) indicates that seven of those years were wet or above normal, one was below normal, three were dry, and one was "critical." What is the evidence, and what are the trial court's findings and conclusions, that support a determination that drought or other of the causes under Article 9(a) lay at the root—were the cause of—Reclamation's failure to provide the contracted-for quantities of water? With the possible exception of two of the years, 1994 and 1995, there is none.

As previously explained in the Background section, for the year 1994 the contract required Reclamation to provide at a minimum 23,350 acre-feet of water to Stockton East and 28,000 acre-feet to Central. Stockton East requested 75,000 acre-feet, and Central requested 25,000. Reclamation provided no water to either. Reclamation's explanation for this breach of the contract cited the general drought conditions, and noted that "every effort is needed to avoid allowing the level of New Melones reservoir to drop below the minimum storage level (300,000 acre-feet) needed to generate power. . . . The available water will be allocated to fish and wildlife, and to meet water quality requirements." J.A. at 3963 (Def.'s Ex. 276).

The trial court held that Reclamation made the determination of shortage on the basis of forecasted hydrology measured against available water storage levels in the New Melones reservoir, held that "the evidence does not support a finding that Reclamation violated Article 12(d),"[36] and concluded that Reclamation validly invoked Article 9(b)'s shortage provision, thereby excusing its non-performance. We note, however, that New Melones started the year 1994 with more than 747,000 acre-feet in its reservoir, and ended the year, despite the drought and after providing for other uses, with 425,000. Had Reclamation provided the 100,000 acre-feet requested by the Districts, there would have remained something over 325,000 acre-feet, more than the minimum needed for power production. Nevertheless, given the uncertainties of supply in a critically dry year, and in order to accord the trial court the deference it is entitled to, we uphold the court's conclusion and affirm its judgment of no liability for the Government for that year.

---

[36]     Stockton, 75 Fed. Cl. at 364.

The year 1995 is similar. In that year, the minimum contract obligation for the two Districts was essentially the same as in 1994, in the range of 25,000-30,000 acre-feet for each. Stockton East initially requested 65,000 acre-feet, and Central 50,000. After negotiations with Reclamation, the requests were scaled down during the year. Reclamation cited the general drought and the related water level conditions as the reason for its inability to meet the requests, and ultimately delivered only about 4,000 acre-feet to each. The trial court held that "the determination of the contracting officer that the shortage was due to causes outside of the control of the United States is supported adequately by the facts,"[37] and again concluded that Reclamation validly invoked the relevant contract provisions so as to excuse its non-performance. Again we note that the year 1995 started with 425,000 acre-feet in the reservoir, and, being a wet year, this time the year concluded with something over 1,800,000 acre-feet, leaving us with a large question about why Reclamation could not meet the relatively minor requests of the Districts for that year. Nevertheless, based on the court's explicit evidentiary findings and conclusions which, under the circumstances, we cannot say are clearly erroneous, we again affirm the trial court's conclusion in favor of the Government for that year.

That, however, is as far as we can go on the record before us. With regard to the remaining years at issue, 1999-2004, the trial court made no such explicit findings and the Government has offered no persuasive explanation for the absence of proof of its defense under Article 9(a) for those years. Furthermore, with the exception of the year 1994 discussed earlier, when New Melones storage was down to 425,504 acre-feet,

---

[37]     Stockton, 75 Fed. Cl. at 364.

and the preceding year, 1993, at 747,512 acre-feet, all the years from 1993 to 2004 had storage levels well above 1,000,000 acre-feet.

Here again the Government was on notice that evidence regarding the impact of the conditions of drought was relevant. The Districts' view of how Article 9(a) should be understood was extensively litigated before the trial court, and made a major matter of contention on appeal. If, in the course of the years of litigation, the evidence was available to the Government that drought caused the shortages of water to the Districts, it behooved the Government to make that evidence of record. It could be expected that, if there was available evidence to support the argument, the Government would have responded to the Districts' case by arguing that, even assuming the Districts' interpretation of Article 9(a) was correct, under the facts of the case the Districts still lose. Having failed to make its case, and given the apparent surplus of water in the New Melones Unit for all of the relevant years, which, as the Districts allege, clearly suggests that drought was not the reason for Reclamation's failure to meet the contract requirements, the failure of the Government to prove its affirmative defense with regard to the years 1999-2004 means that judgment for the Districts on this point should have been granted.

b. The "All Reasonable Means" Issue

Plaintiff Districts and the Government dispute whether Reclamation, in dealing with the water allocations in the years at issue, complied with the opening phrase of Article 9(a) that "the United States will use all reasonable means to guard against a condition of shortage in the quantity of water available to the Contractor pursuant to this contract." Whether that language actually adds anything to the Government's

obligations under the contracts is an open question. Surely both parties to the contracts have a common law duty to perform their contractual duties fairly and in good faith. "A covenant of good faith and fair dealing is implied [in] all contracts. The covenant imposes on a party . . . the duty . . . to do everything that the contract presupposes should be done by a party to accomplish the contract's purpose." 30 Richard A. Lord, Williston on Contracts § 77.10 (4th ed. 1999). Furthermore, as a matter of law, a government agency is obligated to not act in a manner that is arbitrary or capricious. See Administrative Procedure Act, 5 U.S.C. § 706(2)(A). Whether that amounts to an obligation to use all reasonable means to perform its contracted duties is an interesting question.

The simple answer to this apparent conundrum is that on these facts it is of little, if any, consequence. Let us assume, as the Government insists and the plaintiffs deny, that Reclamation used all reasonable means to avoid shortages under the circumstances in which it found itself—Reclamation was unable to both comply with the new allocation priorities and its contractual obligations, so it reasonably under the circumstances chose to breach the contracts. Does that provide a defense to its breach of the contracts? The short answer is no. The abstract question of whether Reclamation used all reasonable means to avoid breaching the contracts is beside the point—a "reasonable" breach of contract is nonetheless a breach.

Let us assume the alternative—except for the two years 1994 and 1995, the Government did not use all reasonable means to avoid shortages.[38] Does that add anything to the conclusion that there was a breach of contract, or to the conclusion that the Government's defenses to that breach are unavailing? Absent a showing that punitive damages are warranted—not present in this case—the moral basis for liability generally is irrelevant to contract damages.

### 3. The Sovereign Acts Defense: Does it absolve the Government of liability?

The Government, anticipating that it might find itself in extremis on its other defenses, falls back on the classic government defense invoked whenever a Congressional enactment or other official government action unsettles what were thought to be settled contractual arrangements. The Government argues that the act of Congress in question, the CVPIA, and the implementation of the CVPIA by governmental agencies, are sovereign acts, and any incidental (and presumably unintended) consequences are simply that, for which the Government cannot be held liable. The argument does not often work; in this case the trial court rejected it, as do we.

The sovereign acts defense was born of a trio of cases decided by the Court of Claims in the nineteenth century. See Conner Bros. Constr. Co. v. Geren, 550 F.3d 1368, 1372 (Fed. Cir. 2008) (discussing Deming v. United States, 1 Ct. Cl. 190 (1865), Jones v. United States, 1 Ct. Cl. 383 (1865), and Wilson v. United States, 11 Ct. Cl. 513

---

[38] With regard to those two years, the trial court found that the Government had in fact acted reasonably. Since on the complexity of the conditions then prevailing we found no basis for saying that finding was clearly erroneous, the assumption is inapplicable.

(1875)). The definitive statement of the doctrine is credited to the Supreme Court's opinion in Horowitz v. United States, 267 U.S. 458, 461 (1925), in which the Court, citing those Court of Claims cases, said, "the United States when sued as a contractor cannot be held liable for an obstruction to the performance of the particular contract resulting from its public and general acts as a sovereign."

The basic notion of the sovereign acts doctrine is that the United States as a contracting party acts in a different capacity from its role as a sovereign. As a contractor, it stands in the same shoes as any private party would in dealing with another private party; as a sovereign, it stands apart. The acts of the one are not to be 'fused' with the other—if an act of the Government as sovereign would justify non-performance by any other defendant being sued for contract breach, then the Government as contractor is equally free from liability for non-performance.

Recently, the sovereign acts doctrine was the Government's final line of defense in the multi-billion dollar liability action arising from Congress's intervention in the savings and loan imbroglio. The Supreme Court's plurality opinion in that case, United States v. Winstar Corp., 518 U.S. 839 (1996), discussed at length the application of the sovereign acts doctrine, id. at 891-911; that discussion has become the current understanding of the doctrine. See Conner Bros., 550 F.3d at 1374 ("[T]his court has treated [the plurality opinion in Winstar] as setting forth the core principles underlying the sovereign acts doctrine.")

In Winstar, the Court explained that "[a]s Horowitz makes clear, [the sovereign acts] defense simply relieves the Government as contractor from the traditional blanket rule that a contracting party may not obtain discharge if its own act rendered

performance impossible." 518 U.S. at 904. The Court posed a two-part test, first asking "whether the sovereign act is properly attributable to the Government as contractor." Id. at 896. That is, is the act simply one designed to relieve the Government of its contract duties, or is it a genuinely public and general act that only incidentally falls upon the contract? If the answer is that the act is a genuine public and general act, the second part of the test asks "whether that act would otherwise release the Government from liability under ordinary principles of contract law." Id. at 896. This second question turns on what is known in contract law as the "impossibility" (sometimes "impracticability") defense. As the Court in Winstar put it, "even if the Government stands in the place of a private party with respect to 'public and general' sovereign acts, it does not follow that discharge will always be available, for the common-law doctrine of impossibility imposes additional requirements before a party may avoid liability for breach." Id. at 904.

Regarding the first part of the test, the Supreme Court in Winstar noted two polar interpretations of what is a public and general act. One is that any official act by the sovereign may qualify as a public and general act regardless of its contractual consequences. The polar opposite is that any act that benefits the sovereign directly by relieving it of its contractual duties in any way is disqualified. Id. at 899. The Court then stated: "Our holding that a governmental act will not be public and general if it has the *substantial effect* of releasing the Government from its contractual obligations strikes a middle course between these two extremes." Id. (emphasis added). Another way of stating the test for whether a governmental act is public and general is that "the

sovereign acts defense is unavailable where the governmental action is specifically directed at nullifying contract rights." Conner Bros., 550 F.3d at 1374.

The trial court in this case did not address the question of whether the CVPIA qualifies as a public and general act, turning instead to the second question: was the ability of the Government to provide the contracted-for quantities of water rendered impossible by the enactment of the CVPIA? At trial, the Districts argued that performance was not impossible because Reclamation could have fulfilled CVPIA water-release requirements by taking water from other CVP reservoirs rather than from New Melones. See Seaboard Lumber Co. v. United States, 308 F.3d 1283, 1294 (Fed. Cir. 2002) (under the common-law doctrine of impossibility, performance is excused only when it is objectively impossible to carry out the contract). The trial court concluded that the Government "did not meet its burden of proof regarding impossibility of performance due to CVPIA § 3406(b)(2), and therefore, would be barred from invoking the sovereign acts and unmistakability doctrines, if liability had been found for breach of the 1983 Contracts." Stockton, 75 Fed. Cl. at 373.

The focus of the Government's argument on appeal is that the trial court defined the scope of the sovereign act too narrowly. Citing Casitas Municipal Water District v. United States, 543 F.3d 1276, 1287-88 (Fed. Cir. 2008), the Government contends that the sovereign act at issue includes not only the CVPIA but also the decision by Reclamation and FWS[39] to use water from New Melones to satisfy CVPIA requirements. But even assuming the sovereign act is understood to include the

---

[39] The Government alleges that FWS dictated how much of the 800,000 acre-feet of water required by CVPIA § 3406(b)(2) was to come from New Melones each year.

agencies' discretionary implementation of the CVPIA, the Government would have to demonstrate that the agencies' actions made it impossible for Reclamation to deliver to the Districts the full amount of water provided for in the contracts, a showing the Government has not made.

Furthermore, even if the specific implementation of the CVPIA chosen by the agencies rendered performance impossible, the Government cannot rely on the sovereign acts doctrine without returning to the first part of the test and establishing that such implementation is a public and general act. Here it is obvious that Reclamation's operational decisions to comply with the CVPIA by denying water to the Districts in violation of its duties under the contract fail the test of a "public and general" act. The only users affected negatively by Reclamation's actions were the Districts. The conduct of Reclamation in shorting the Districts, presumably in order to make the water available for other users, was directly aimed at the contracts and Reclamation's duties under them, nullifying the rights of the Districts to receive water under the contracts. Whether viewed in terms of having a "substantial effect of releasing the Government from its contractual obligations," Winstar, 518 U.S. at 899, or as a "governmental action . . . specifically directed at nullifying contract rights," Conner Bros., 550 F.3d at 1374, Reclamation's acts here cannot qualify as public and general.

Whether under the first part or the second part of the analysis set out by the Supreme Court, the Government's sovereign acts defense does not survive scrutiny. The trial court correctly rejected that defense, and is affirmed on that point.

## C. The Takings Issue

The trial court early in its opinion noted that the takings claim, which was initially the reason why the case was transferred from the district court to the Court of Federal Claims, was stayed pending resolution of the contract claim. The latter claim was raised by plaintiffs in an amendment to the complaint after the transfer. The trial court expressly stated that "[t]he takings claims [sic] were stayed pending resolution of the contract claims [sic] and were not at issue at trial." Stockton, 75 Fed. Cl. at 324 n.2.

Some fifty pages later, the trial court ruled, without further opportunity for the parties to be heard, that the takings claim was dismissed. The court, citing Hughes Communications Galaxy, Inc. v. United States, 271 F.3d 1060 (Fed. Cir. 2002), opined that, since there was a contract claim, the Government was acting in its commercial capacity and a separate constitutional takings claim could not lie. Stockton, 75 Fed. Cl. at 373-74. That is not a correct understanding of the law.

It is true that there is language in earlier cases from this court to the effect that "[i]n general, takings claims do not arise under a government contract because . . . the government is acting in its proprietary rather than its sovereign capacity, and because remedies are provided by the contract." See St. Christopher Assocs., L.P. v. United States, 511 F.3d 1376, 1385 (2008) (citing Hughes, 271 F.3d at 1070). But that language is nothing more than a passing comment about government contract law, and has to be understood in that context.

It cannot be understood as precluding a party from alleging in the same complaint two alternative theories for recovery against the Government, for example, one for breach of contract and one for a taking under the Fifth Amendment to the

Constitution. That is expressly permitted by the Federal Rules, and the fact that the theories may be inconsistent is of no moment. See Fed. R. Civ. P. 8(d)(3) ("A party may state as many separate claims . . . as it has, regardless of consistency.").

On the other hand, it can be understood to mean that, when a case arises in which both a contract and a taking cause of action are pled, the trial court may properly defer the taking issue, as it did here, in favor of first addressing the contract issue. It has long been the policy of the courts to decide cases on non-constitutional grounds when that is available, rather than reach out for the constitutional issue. See Nw. Austin Mun. Util. Dist. No. One v. Holder, 129 S. Ct. 2504, 2513 (2009). And of course when a plaintiff is awarded recovery for the alleged wrong under one theory, there is no reason to address the other theories.

In Hughes, the plaintiff, having been awarded contract damages against the Government, sought prejudgment interest on its damages award as if there had been a simultaneous Fifth Amendment taking. The trial court refused to award the interest. On appeal, we affirmed the trial court. We noted that "[t]his court's predecessor has cautioned against commingling takings compensation and contract damages," and explained that these were two separate causes of action, one based on the Government acting in its proprietary capacity, and one based on the Government as sovereign. Hughes, 271 F.3d at 1070. Our court went on to note that, in any event, plaintiff had failed to prove a taking, only a contractual right. Id.

In Sun Oil Co. v. United States, 572 F.2d 786 (Ct. Cl. 1978), also cited as support by the trial court, the suit was by a group of oil companies against the United States for an alleged breach of a lease agreement including denial of a permit. The court held for

the oil companies on the permit issue. Plaintiffs had also included in their complaint a Fifth Amendment takings claim, regarding which the court commented that it was difficult to tell whether that claim was an independent and additional claim or an alternative claim. The court treated it as an alternative claim, and opined that "recovery on one claim theory would seem to preclude recovery on the other claim theory." Id. at 817-18. Nevertheless, because the parties had placed much importance on the takings question, the court proceeded to discuss it, and held there was no taking. Id. at 819.

It is well established, as these cases explain, that a party can obtain only one recovery for a single harm regardless of how many legal theories there may be for a recovery. In our case, while one recovery is all that can be had for the same harm, the fact that a cause of action was pled under a contract theory did not preclude a separate count for a cause of action based on a taking. Certainly this is the case when the Government alleges it was acting within its authority in breaching the contract. Of course, as Sun Oil illustrates, the fact that an alternative theory for recovery can be posited does not mean that a recovery under that theory will prevail.

In this case, the trial judge denied the contract claim, and then dismissed without trial the takings claim on the ground that the contract claim precluded the takings claim. That is error. To the extent that the trial court purported to issue a judgment regarding the takings count in the complaint, that judgment is vacated.

*************************************

To sum up: the Districts and Reclamation have binding contracts for specified quantities of water which Reclamation is obligated to provide. As the trial court found, Reclamation failed to provide those specified quantities in the years at issue. The first

defense raised by the Government, that Reclamation had implicit authority to reallocate the water in the New Melones unit in response to a change in law and policy, is not a valid defense on this record. The second defense raised by the Government, that the shortages were the result of causes "beyond the control of the United States" such as to absolve it under the contract provisions, specifically Articles 9(a) and 12(d), again, with the exception of 1994 and 1995, on this record fails for lack of proof. Except for those two years, the trial court's contrary determinations regarding these defenses are reversed.

With regard to the defense under the sovereign acts doctrine, the trial court was correct; that doctrine is unavailing and the trial court is affirmed thereon. Finally, as noted, the dismissal of the takings claim is vacated. The Districts are free to pursue their takings claim if they so choose with regard to the years for which the Government has been found not liable as a matter of contract law. We offer no opinion on the validity or propriety of such a claim.

Regarding the breach of contract claim here before this court, the case is remanded for a determination of damages for the years for which the Government is liable.

CONCLUSION

<u>AFFIRMED-IN-PART, REVERSED-IN-PART, VACATED-IN-PART, and REMANDED</u>

GAJARSA, <u>Circuit Judge</u>, dissents.

| Year | Year Type | OID/SSJID | OID/SSJID Transfer to Stockton East | OID/SSJID Year by Year Transfer to Central | Contract Deliveries to Central | Contract Deliveries to Stockton East | Water Quality Ripon DO | Water Quality Vernalis | CADFG '87 Agrmnt. 98.3-302.1 | CVPIA Section (b)(1) | CVPIA Section (b)(2) and Bay/Delta Flows Vernalis | CVPIA Section 3406 (g) and 3406(b)(3) | Total Goodwin Release | Flood Release | Flood Release to Canals | Oakdale Fish Release | New Melones Storage | Date |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | af | af | af | af | af | af | af | af | af | af | af | af | af | | af | af | af |
| 1993 | wet | 480,965 | 0 | 0 | 0 | 0 | 0 | 59,798 | 95,298 | 0 | 135,683 | 0 | 307,860 | 17,082 | 0 | 0 | 747,512 | 12/31/1993 |
| 1994 | critical | 467,480 | 0 | 0 | 0 | 0 | 0 | 134,430 | 99,745 | 0 | 33,463 | 37,137 | 304,774 | 0 | 0 | 0 | 425,405 | 12/31/1994 |
| 1995 | wet | 482,278 | 0 | 0 | 4,564 | 4,003 | 61,547 | 0 | 97,640 | 0 | 136,653 | 12,169 | 341,417 | 26,654 | 0 | 0 | 1,825,784 | 12/31/1995 |
| 1996 | wet | 564,336 | 0 | 0 | 17,508 | 15,197 | 0 | 23,254 | 292,784 | 0 | 117,011 | 0 | 875,308 | 442,259 | 0 | 0 | 2,010,765 | 12/31/1996 |
| 1997 | wet | 514,838 | 0 | 0 | 27,537 | 23,256 | 0 | 83 | 301,527 | 0 | 79,575 | 49,954 | 1,193,722 | 762,583 | 22,486 | 0 | 1,853,036 | 12/31/1997 |
| 1998 | wet | 513,871 | 0 | 0 | 23,066 | 21,343 | 0 | 0 | 302,083 | 0 | 129,134 | 49,970 | 1,235,784 | 754,598 | 19,760 | 0 | 1,976,861 | 12/31/1998 |
| 1999 | above normal | 506,962 | 4,120 | 0 | 33,786 | 31,112 | 2,767 | 0 | 302,033 | 0 | 133,010 | 64,405 | 823,916 | 321,701 | 3,325 | 0 | 1,881,166 | 12/31/1999 |
| 2000 | above normal | 476,652 | 32,960 | 0 | 27,759 | 7,377 | 1,537 | 0 | 308,085 | 0 | 98,819 | 18,785 | 569,685 | 142,459 | 0 | 0 | 1,875,625 | 12/31/2000 |
| 2001 | dry | 479,427 | 23,600 | 0 | 25,747 | 7,030 | 16,020 | 112,356 | 110,926 | 0 | 69,705 | 33,364 | 342,371 | 0 | 0 | 0 | 1,516,405 | 12/31/2001 |
| 2002 | dry | 506,620 | 34,200 | 20,000 | 10,508 | 3,493 | 28,340 | 105,574 | 96,865 | 0 | 70,245 | 25,974 | 326,997 | 0 | 0 | 219 | 1,358,261 | 12/31/2002 |
| 2003 | below normal | 477,384 | 30,000 | 15,000 | 9,846 | 2,210 | 57,878 | 110,793 | 99,134 | 0 | 67,732 | 33,180 | 371,738 | 0 | 0 | 3,023 | 1,320,530 | 12/31/2003 |
| 2004 | dry | 516,349 | 29,470 | 10,000 | 13,605 | 1,486 | 7,741 | 70,566 | 99,348 | 0 | 76,030 | 29,341 | 283,027 | 0 | 0 | 0 | 1,214,384 | 12/31/2004 |
| Total | | 5,987,182 | 154,350 | 45,000 | 193,925 | 116,506 | 175,831 | 616,854 | 2,205,467 | 0 | 1,147,059 | 354,278 | 6,976,600 | 2,467,335 | | 3,242 | 18,005,734 | |