RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 22a0202p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

EATON CORPORATION AND SUBSIDIARIES,
                    *Petitioner-Appellee/Cross-Appellant*,

  *v*.

COMMISSIONER OF INTERNAL REVENUE,
                    *Respondent-Appellant/Cross-Appellee*.

> Nos. 21-1569/2674

Appeal from the United States Tax Court;
No. 5576-12—Kathleen M. Kerrigan, Judge.

Argued:  July 21, 2022

Decided and Filed:  August 25, 2022

Before:  DONALD, BUSH, and NALBANDIAN, Circuit Judges.

─────────────────

**COUNSEL**

**ARGUED:**  Judith A. Hagley, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellant/Cross-Appellee.  Shay Dvoretzky, SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP, Washington, D.C., for Appellee/Cross-Appellant.  **ON BRIEF:**  Judith A. Hagley, Francesca Ugolini, Arthur T. Catterall, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellant/Cross-Appellee.  Shay Dvoretzky, Raj Madan, Nathan Wacker, Parker Rider-Longmaid, Sylvia O. Tsakos, SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP, Washington, D.C., Brian Kittle, MAYER BROWN LLP, New York, New York, for Appellee/Cross-Appellant.

———————————

**OPINION**

———————————

NALBANDIAN, Circuit Judge.  Taxes may well be "what we pay for civilized society," *Compania Gen. de Tabacos de Filipinas v. Collector of Internal Revenue*, 275 U.S. 87, 100 (1927) (Holmes, J., dissenting), but that doesn't mean the tax collector is above the law.  This case arises from the IRS's efforts to circumvent basic contract law.

Eaton Corporation and the IRS entered into two contracts: a pair of advance pricing agreements ("APAs") meant to govern Eaton's tax calculations from 2001 through 2010.  A few years after entering in to the APAs, Eaton reviewed its records and caught some inadvertent calculation errors.  After letting the IRS know, Eaton corrected the mistakes.  But the IRS thought that Eaton's mistakes were serious enough to warrant its unilateral cancellation of the APAs for tax years 2005 and 2006.  And after cancelling the APAs, the IRS handed Eaton a notice claiming a deficiency of tens of millions of dollars.  Eaton filed a petition in the Tax Court, challenging the deficiency notice and the IRS's cancellation of the APAs.

The Tax Court sided with Eaton on the major issues, concluding that the IRS had wrongfully cancelled the APAs.  The parties raise a much-narrowed subset of arguments in their dueling appeals.  For the reasons below, we affirm in part and reverse in part, siding with Eaton on all issues presented.

I.

A.  The Tax Framework

Many corporations have overseas affiliates.  This presents a challenge for the IRS.  An American corporation can exploit its international network to minimize its income-tax liability in the following way: Rather than purchase products that it needs through an arm's-length transaction like everyone else (e.g., for $50 million), it can instead buy the products from its foreign subsidiary at an inflated price (e.g., $100 million).  This inflated "transfer price" allows the corporation to Trojan Horse a chunk of its taxable income (and its income tax liability) into a

lower-tax jurisdiction. In this example, the corporation's cost of goods sold in the U.S. increases by $50 million. And because cost of goods sold is a deductible, the corporation's taxable income in the U.S. decreases by that same amount. Meanwhile, the other $50 million ends up taxed at a lower rate in some other country.

To tackle this problem, Congress furnished the IRS with 26 U.S.C. § 482. Together with its implementing regulations, § 482 empowers the IRS to bring down the transfer price to reflect a counterfactual arm's-length transaction "with an uncontrolled taxpayer." Treas. Reg. § 1.482-1(b)(1). Figuring out that counterfactual transfer price requires some advanced math calculations.

Not surprisingly, the IRS and taxpayers frequently disagree over how to calculate these arm's-length prices. To help minimize the number of these disputes, the IRS introduced APAs in 1990. Under the scheme, the IRS and a taxpayer can agree on a calculation method in advance and embed it into a contract. As the IRS's Revenue Procedures confirm, "[a]n APA is a binding agreement between the taxpayer and the Service." Rev. Proc. 2004-40, § 9.01; Rev. Proc. 96-53, § 10.01.

## B. Eaton and the IRS

That brings us to the parties in this case. Eaton is an Ohio corporation with a global footprint. It manufactures a wide range of electrical and industrial products. These include what Eaton calls "Breaker Products": important safety components, such as circuit breakers, which feature in a broad spectrum of electromechanical devices. (R. 735, July 26, 2017 Op., p. 13.) During the relevant period—2005 and 2006—Eaton had its foreign subsidiaries in Puerto Rico and the Dominican Republic (the "Island Plants") manufacture these Breaker Products. Afterwards, Eaton sold the Breaker Products to its other affiliates and third-party customers.

In 2002, Eaton applied for an APA. And in 2004, after eighteen months of negotiation and investigation, the IRS and Eaton entered into the first of their two APAs ("APA-I"). APA-I covered tax years 2001 through 2005. Then in 2006, after two more years of intensive negotiation and investigation, the parties entered into their second APA ("APA-II"). APA-II covered tax years 2006 through 2010. Both APAs incorporated the IRS's Revenue Procedures.

More specifically, "Revenue Procedure 96-53 governs the interpretation, legal effect, and administration of" APA-I.**1** (R. 41, APA-I, p. 3.) And "Revenue Procedure 2004-40 governs" as to APA-II.**2** (R. 41, APA-II, p. 2.)

In simplified terms, the APAs spell out a transfer-pricing methodology ("TPM") that requires Eaton to calculate the transfer price using two steps. First, both APAs adopted a comparable uncontrolled price ("CUP") method, which pegs the transfer price at levels that third parties pay when purchasing Eaton's Breaker Products. Before moving on to the second step, Eaton would use the CUP to calculate hypothetical profits. The second step required Eaton to calibrate the CUP using a comparable profits method ("CPM"). More specifically, the CPM compares Eaton's CUP-yielded hypothetical profits against the profits of similarly situated companies. The CPM measures these profits using something called the "Berry ratio": namely, the ratio of gross profits to operating expenses. If Eaton's Berry ratio came out too high (by exceeding the permissible range specified in the APAs), Eaton had to dial down the transfer price accordingly.

On top of this, the APAs required Eaton to file annual reports. These reports are part and parcel of the typical APA bargain. Specifically, "the taxpayer is required to file an annual report demonstrating compliance with the APA for each covered APA year, and putting the Service on notice if critical assumptions have been violated or material facts have changed." IRS Announcement 2000-35, 2000-1 C.B. 922, 943.

---

**1**Revenue Procedure 96-53's cancellation subsection says: "The Associate Chief Counsel (International) may cancel the APA if the District Director, with the concurrence of the Associate Chief Counsel (International), determines that there was a misrepresentation, mistake as to a material fact, failure to state a material fact, or lack of good faith compliance with the terms and conditions of the APA (but not fraud, malfeasance or disregard) in connection with the request for the APA, or in any subsequent submissions (including the annual report). Material facts are those that, if known by the Service, would have resulted in a significantly different APA (or no APA at all)." Rev. Proc. 96-53, § 11.06(1).

**2**Revenue Procedure 2004-40's cancellation subsection contains similar language: "The Associate Chief Counsel (International) or designee may cancel an APA due to the failure of a critical assumption, or due to the taxpayer's misrepresentation, mistake as to a material fact, failure to state a material fact, failure to file a timely annual report, or lack of good faith compliance with the terms and conditions of the APA. The Associate Chief Counsel (International) will consider facts as material if, for example, knowledge of the facts could reasonably have resulted in an APA with significantly different terms and conditions. In regard to annual reports, the Associate Chief Counsel (International) will consider facts as material if, for example, knowledge of the facts would have resulted in (a) a materially different allocation of income, deductions, or credits than reported in the annual report or (b) the failure to meet a critical assumption." Rev. Proc. 2004-40, § 10.06(1).

Skip forward to 2007, when things started to turn south. That's when the IRS began auditing Eaton's 2005 and 2006 tax returns. These audits continued through 2009, at which point the IRS expanded its review to Eaton's APA implementation. That same year, Eaton began its own review of company records. And it discovered a series of inadvertent miscalculations, some that generally favored the IRS and others that favored Eaton.[3]

As for the former, Eaton made mistakes in applying the TPM itself, which directly "affected the computation of the transfer price." (R. 735, July 26, 2017 Op., p. 96.) These errors are not at issue here. On the other hand, Eaton made some errors in applying something called the APA Multiplier, and these inured to Eaton's benefit. The APA Multiplier and its implementation are at the heart of this appeal.

What, then, is the APA Multiplier? Importantly, it is *not* part of the TPM itself. Rather, it's an algebraic factor that exists because the TPM and Eaton's internal records use different accounting language. The APA Multiplier translates the TPM-calculated prices into numbers that slot into Eaton's bookkeeping. More specifically, it does this by "express[ing] the transfer price as a percentage of manufacturing costs," consistent with the rest of Eaton's records. (*Id.*, p. 92.) Using the APA Multiplier in this way allowed Eaton to "generate invoices on a day-to-day and month-to-month basis" and satisfy quarterly reporting requirements even when only interim transfer prices were available. (R. 601, Aug. 31, 2015 Dep. Tr., pp. 1506-07.) Eaton would calculate "a preliminary APA multiplier" based on interim transfer prices. (R. 735, July 26, 2017 Op., pp. 93-94.) And when the final transfer price became available, Eaton would true-up on the back end with "a final APA multiplier." (*Id.*)

Eaton used these translated numbers to complete its tax returns. But just one problem: Eaton inadvertently used the wrong denominator when calculating the APA Multiplier. This, in turn, inflated the transfer price reported on the tax returns (by about five percent) and deflated Eaton's tax liability. Although Eaton's tax returns ended up with the wrong numbers in

---

[3]It does not appear as though Eaton identified and corrected its errors directly *in response* to the IRS's years-long audit. On the contrary, Eaton discovered its errors after it onboarded two new transfer pricing managers. As these managers began familiarizing themselves with Eaton's records, they noticed some discrepancies. They elevated the errors up the company hierarchy, and Eaton disclosed the errors not long after.

this way, its annual reports contained the accurate TPM-calculated prices. That's because the numbers on the annual reports didn't go through the APA Multiplier-translation process that yielded Eaton's tax returns. With that said, the annual reports still contained some misrepresentations—namely that Eaton's tax returns listed the correct numbers.

In April 2010, Eaton informed the IRS of its unintended errors. By October, Eaton had corrected the errors and submitted amended tax returns. Nevertheless, in December 2011, the IRS went on to cancel the APAs for tax years 2005 and 2006. In a letter, the IRS explained that several "material deficiencies in APA compliance" warranted cancellation, including "mistake as to a material fact," "failure to state a material fact," and "errors in the supporting data and computations used in the transfer pricing methodologies." (R. 41, Dec. 16, 2011 Letter, p. 1.) Shortly after that, the IRS sent a deficiency notice claiming that Eaton owed $19,714,770 for 2005 and $55,323,229 for 2006. And the IRS assessed 26 U.S.C. § 6662(h) penalties as well: $14,281,960 for 2005 and $37,329,600 for 2006. Section 6662(h) permits the IRS to levy 40 percent penalties for "gross valuation misstatements" by the taxpayer.

## C. Proceedings Below

In February 2012, Eaton filed a petition in the United States Tax Court to challenge the deficiencies. Before the case reached trial, the Tax Court disposed of two threshold issues. To begin with, the Tax Court held that its "deficiency jurisdiction includes reviewing the [IRS's] cancellations [of the APAs] because they are necessary to determine the merits of the deficiencies." (R. 76, June 26, 2013 Op., p. 13.) And next, it held that an abuse-of-discretion standard governs the cancellation question, with Eaton bearing the burden of proof. In other words, the court held, Eaton had to "show that the Commissioner's action was arbitrary, capricious or without sound basis in fact." (*Id.*, p. 15.) Along the way, the Tax Court rejected Eaton's argument that "common law contract principles" required the IRS to carry the burden to prove grounds to cancel the APAs. (*Id.*, p. 14.) Then in 2016, the presiding Tax Court judge (Judge Kroupa) pleaded guilty to tax evasion, and a new judge (Judge Kerrigan) took her place.

The case proceeded to trial.  The IRS raised no fewer than 17 justifications for cancelling the APAs.  After trial, the Tax Court issued a 202-page opinion.  To begin with, it declined to revisit Judge Kroupa's holding that Eaton had the burden to show abuse of discretion.  But the Tax Court went on to find that Eaton had carried its burden and rejected all 17 grounds advanced by the IRS.  In the Tax Court's view, not only were Eaton's errors "inadvertent," they also did "not fit the APA governing revenue procedures' definition of 'material.'"  (R. 735, July 26, 2017 Op., p. 193.)  And thus, the Tax Court concluded, "it was an abuse of discretion for [the IRS] to cancel [the APAs]."  (*Id.*, pp. 192.)

In a follow-up order, the Tax Court rejected the IRS's claim for 40 percent penalties under 26 U.S.C. § 6662(h) for Eaton's self-reported corrections.  In doing so, it sidestepped two of Eaton's principal arguments:  that the IRS forfeited its penalties claim and failed to obtain the supervisory approval required by 26 U.S.C. § 6751(b).  Instead, the Tax Court held simply that Eaton's self-corrections did not constitute § 482 adjustments as a threshold matter.  And because § 6662(h) penalties apply only to § 482 adjustments, the IRS's penalties assessment was left with no leg to stand on.

One final order rounds out the set.  Invoking Revenue Procedure 99-32, Eaton sought relief from double taxation for its corrections.  Consistent with its prior holding that Eaton's self-corrections didn't constitute § 482 adjustments, the Tax Court denied relief.  It reasoned that relief under Revenue Procedure 99-32 applies to § 482 adjustments only.

The IRS appealed to challenge the Tax Court's holdings on cancellation and penalties.  It now asserts substantially fewer grounds for cancellation.  As the IRS sees it, Eaton's (alleged) failure to disclose its use of the APA Multiplier, its miscalculation of that same multiplier, and the representations in its annual reports (to the effect that Eaton's tax returns contained accurate numbers) constituted "failure to state" or "mistake as to" "material fact[s]."  (First Br., p. 54 (internal quotation omitted).)  Eaton cross-appealed to reassert its Revenue Procedure 99-32 double tax claim.

II.

"We review the Tax Court's interpretation and application of law de novo, and its factual findings for clear error." *Losantiville Country Club v. Comm'r*, 906 F.3d 468, 472 (6th Cir. 2018) (citation omitted).

III.

A.  Wrongful Cancellation:  Burden of Proof

The threshold question is this: Who has the burden?  Both APAs incorporated the Revenue Procedures, which say that the IRS "may cancel" the agreement for various enumerated grounds, including, among other things, "mistake as to a material fact" or the "failure to state a material fact."  Rev. Proc. 2004-40, § 10.06(1); Rev. Proc. 96-53, § 11.06(1).  Must the IRS prove these grounds consistent with contract-law principles, or is it Eaton's burden to show that the cancellation was "plainly arbitrary"?  (First Br., p. 36 (internal quotation omitted).)

The IRS has the burden.  In arguing to the contrary, the IRS hides behind administrative deference to avoid the consequences of its bargain.  In its view, after the parties spent years negotiating a bargain of this complexity, the government can simply rip up the contract unless the taxpayer can show that doing so is "plainly arbitrary." (*Id.*)  Cancelling a contract is just like any other agency determination—forget about what contract law demands, says the IRS.  We disagree.  Neither the available cases nor the IRS's own regulations and procedures support the IRS's argument.

To begin with, the IRS's own Revenue Procedures confirm that APAs are contracts:  "An APA is a binding agreement between the taxpayer and the Service."  Rev. Proc. 2004-40, § 9.01; Rev. Proc. 96-53, § 10.01.  (*See also* R. 41, APA-I, p. 5 ("This *contract* binds . . . any successor in interest to Taxpayer."  (emphasis added)); R. 41, APA-II, p. 4 (same).)  The IRS appears to admit as much.  (*See* Third Br., p. 9 ("There is no dispute that the APAs are binding agreements. The Commissioner merely seeks to exercise his rights under those agreements."  (internal quotation and citation omitted)).)  Indeed, the IRS routinely enters into contracts with taxpayers,

whether through closing agreements that straighten out disagreements over past tax years or offers-in-compromise that settle tax debts for less than the amount owed.

And the caselaw makes it quite clear that "[w]hen the United States enters into contract relations, its rights and duties therein are governed generally by the law applicable to contracts between private individuals." *United States v. Winstar Corp.*, 518 U.S. 839, 895 (1996) (quoting *Lynch v. United States*, 292 U.S. 571, 579 (1934)).  This principle naturally extends to the IRS's dealings with taxpayers.  *See, e.g.*, *Rink v. Comm'r*, 47 F.3d 168, 171 (6th Cir. 1995) ("A closing agreement [between the IRS and a taxpayer] is a contract, and generally is interpreted under ordinary contract principles."); *Dutton v. Comm'r*, 122 T.C. 133, 138 (2004) (holding that an offer-in-compromise between a taxpayer and the IRS "is governed by general principles of contract law").

So contract law applies, but what does it say?  It requires a party to prove the exception that allows it to back out of contractual promises.  *See Meacham v. Knolls Atomic Power Lab'y*, 554 U.S. 84, 91 (2008) ("[W]hen a proviso . . . carves an exception out of the body of a statute or contract[,] those who set up such exception must prove it."  (quoting *Javierre v. Cent. Altagracia*, 217 U.S. 502, 508 (1910) (Holmes, J.))); *New Britain Mach. Co. v. Yeo*, 358 F.2d 397, 406 (6th Cir. 1966) ("[T]he law as to the burden of proof is that [a] party who seeks advantage of an exception in a contractual stipulation as the basis of his claim is charged with the burden of proving facts necessary to bring himself within such exception."  (internal quotation omitted)).

Courts have applied this principle in a wealth of cases involving the government.  For example, the government carries the burden when it seeks to terminate a contract with a private party for default.  *See Johnson Mgmt. Grp. CFC, Inc. v. Martinez*, 308 F.3d 1245, 1249 (Fed. Cir. 2002) ("The government bears the burden of proof in establishing the validity of a default termination."); *Lisbon Contractors, Inc. v. United States*, 828 F.2d 759, 765 (Fed. Cir. 1987) ("[T]he government should bear the burden of proof with respect to the issue of whether termination for default was justified . . . .").  The same goes for a party that wants to void an agreement with the IRS, such as a settlement agreement or a closing agreement.  *Vulcan Oil Tech. Partners v. Comm'r*, 110 T.C. 153, 163-64 (1998) (holding that taxpayers failed to satisfy

their burden to show "fraud, malfeasance, or misrepresentation of fact" in seeking to set aside settlement agreement with the IRS); *Tree-Tech, Inc. v. Comm'r*, 102 T.C.M. (CCH) 31 (2011) ("The party seeking to set aside the closing agreement bears the burden of proving fraud, malfeasance, or misrepresentation." (citation omitted)).

In response, the IRS rehashes the Tax Court's logic: namely, that administrative deference governs because the parties "agree[d] that the legal effect and administration are governed by the applicable terms of the revenue procedures." (Third Br., p. 41 (quoting R. 76, June 26, 2013 Op., p. 13 n.4.).) Or put another way, "the APAs—by their express terms—are subject to the discretion reserved to the IRS by the applicable Revenue Procedures." (*Id.*)

But the problem is that the Revenue Procedures never "reserved" discretion in this way. On the contrary, they confirm that "[a]n APA is a binding agreement between the taxpayer and the Service," which circles the analysis back to contract law. Rev. Proc. 2004-40, § 9.01; Rev. Proc. 96-53, § 10.01. True, the Revenue Procedures carve out *some* deference insofar as it says the IRS "*may*" (not *must*) cancel the APA if an enumerated condition obtains. Rev. Proc. 2004-40, § 10.06(1) (emphasis added); Rev. Proc. 96-53, § 11.06(1) (emphasis added). But as Eaton put it, "that discretion to cancel *when* a condition is satisfied is not discretion to conclusively determine *that* a condition is satisfied." (Second Br., p. 46.) Indeed, the Revenue Procedures go on to say that the IRS "is not required to cancel the APA [even when a condition is satisfied]" and may enforce the APA instead. Rev. Proc. 2004-40, § 10.06(2); Rev. Proc. 96-53, § 11.06(2). *This* is the proper locus of the IRS's limited discretion under the APAs.

This case is not so different from *Oakland Bulk & Oversized Terminal, LLC v. City of Oakland*, 960 F.3d 603 (9th Cir. 2020). At issue there was a contract between the City of Oakland and a developer. *Id.* at 607. Under the contract's express terms, Oakland could apply additional regulations against the developer only if "substantial evidence" showed a need. *Id.* at 608. Oakland tried to use that language to sneak in administrative law principles. More precisely, it argued that "the district court should have . . . adhered to administrative law review principles by limiting evidence to the record before the city council when it enacted the disputed [language]." *Id* at 609. But in the developer's view, the City's interpretation ran afoul of both the provision's express terms and "the traditional rules that govern a breach of contract case."

*Id.* The Ninth Circuit agreed with the developer, not least because the contract "refer[red] to 'substantial evidence,' not 'substantial evidence review.'" *Id.* at 609–10.

Or take another example, this time from the Federal Circuit. In *Stockton East Water District v. United States*, a pair of California water agencies entered into contracts with the federal government. 583 F.3d 1344, 1348 (Fed. Cir. 2009). Under the bargain, the federal government had to provide certain quantities of water to the agencies. *Id.* The federal government failed to perform, and the agencies sued for breach. In response, the federal government claimed that the contracts were, "by their inherent nature[,] subject to changes" in "future federal law or policy." *Id.* at 1357. In other words, infused into the contracts were "background principles" arising from "the basic nature of contracts with a sovereign United States." *Id.* The Federal Circuit rejected this argument, explaining that the federal government's "defenses are circumscribed by the terms in which they are cast, so that the exculpatory provisions apply only in the specified circumstances." *Id.* at 1358. Anything else renders the contracts "illusory." *Id.* at 1357. What's more, the Federal Circuit clarified that "the usual standards of proof for civil litigation" govern, meaning the "burden of persuasion" fell on the federal government to prove its defenses. *Id.* at 1360.

Similar logic plays out here. The parties *could* have specified a more pro-government burden in the APAs. But they *didn't*. Instead, they embedded cancellation language that reads similar to something out of a mine-run contract. To be sure, the parties incorporated the Revenue Procedures' text. But that text says nothing about lopsided burdens of proof. After all, it makes little sense that a sophisticated party like Eaton would expend years negotiating over the minutiae of its convoluted bargain, only to leave so much in the hands of the government. Little surprise, then, that none of the cases that the IRS marshals on this front involve *contracts*.

Nor does the IRS's invocation of Tax Court Rule 142(a) change things. That rule says that "[t]he burden of proof shall be upon the petitioner, except as otherwise provided by statute or determined by the Court." T.C. R. 142(a). But this rule does no more than set the default principle for routine tax disputes. It says nothing about contract law questions that are before the Tax Court. And indeed, to reiterate, the Tax Court has historically deferred to contract law principles (as it must) when assessing burdens in contract disputes. *See, e.g.*, *Vulcan Oil Tech.*

*Partners*, 110 T.C. at 163-64; *Tree-Tech, Inc.*, 102 T.C.M. (CCH) at 31. In other words, the Tax Court's precedents "provide[]" "otherwise." T.C. R. 142(a).

Thus, the IRS has the burden here, consistent with contract-law principles. To be sure, the government has broad discretion to enter into contracts with private parties. But once it enters into a contract, the government must play by the rules like everyone else. And that's precisely why the IRS's related claim that the Tax Court "erroneously substituted its judgment for that of the IRS" gets nowhere. (First Br., p. 57.) It wasn't the Tax Court that displaced the IRS's discretion; the IRS did that to itself by entering into a contract. To say otherwise here risks "creat[ing] an escape hatch for the government to walk away from contractual obligations." *Oakland Bulk*, 960 F.3d at 612. "The house (of government) would always win," and good-faith bargains would end up as something else entirely. *Id.*

## B. Wrongful Cancellation: Merits

The principal question raised in this appeal is next: Has the IRS established grounds to cancel the APAs? The IRS says yes, pointing to Eaton's alleged failure to disclose the APA Multiplier, its calculation errors, and its representations in the annual reports. The IRS's arguments miss the mark.

*Defining the grounds for cancellation.* The first step is to define the grounds for cancellation. As previewed above, the Revenue Procedures provide exhaustive lists in a subsection called "Cancelling the APA." Rev. Proc. 2004-40, § 10.06; Rev. Proc. 96-53, § 11.06. Revenue Procedure 2004-40's version of that subsection explains that the IRS "may cancel" an APA for "the failure of a critical assumption," "the taxpayer's misrepresentation, mistake as to a material fact, failure to state a material fact, failure to file a timely annual report, or lack of good faith compliance with the terms and conditions of the APA." § 10.06(1). Revenue Procedure 96-53 offers a nearly identical list: "misrepresentation, mistake as to a material fact, failure to state a material fact, or lack of good faith compliance with the terms and conditions of the APA." § 11.06(1).

It stands to reason that these lists are exhaustive. After all, under the *expressio unius* canon, "[t]he expression of one thing implies the exclusion of others." Antonin Scalia & Bryan

Garner, *Reading Law: The Interpretation of Legal Texts* 107 (2012). And neither can the IRS scavenge out additional cancellation grounds from elsewhere in the Revenue Procedures. After all, why would the Revenue Procedures carve out a subsection for cancellation but then hide additional grounds somewhere else?

But be that as it may, the IRS urges us to look beyond the cancellation subsection. It claims that a subsection called "Examination" provides extra grounds for cancellation. It points in particular to that subsection's language concerning errors in "the supporting data and computations" used in applying the TPM. Rev. Proc. 2004-40, § 10.03(2); Rev. Proc. 96-53, § 11.03(2). But there, the Revenue Procedures discuss what the IRS "may require the taxpayer to establish" as part of its enforcement of the APAs, *not* conditions which necessarily suffice to trigger cancellation. Rev. Proc. 2004-40, § 10.03(2); Rev. Proc. 96-53, § 11.03(2). The subsection includes other things that the IRS "may require the taxpayer to establish" as well, some that overlap with the cancellation subsection and others that do not. Rev. Proc. 2004-40, § 10.03(2); Rev. Proc. 96-53, § 11.03(2). These include good faith compliance with the APA, materially accurate APA reports, consistent application of the TPM, and continued satisfaction of the "critical assumptions." Rev. Proc. 2004-40, § 10.03(2); Rev. Proc. 96-53, § 11.03(2).

It's well-established that the "use of 'explicit language' in one provision 'cautions against inferring' the same limitation in another provision." *Delek US Holdings, Inc. v. United States*, 32 F.4th 495, 501 (6th Cir. 2022) (quoting *State Farm Fire & Cas. Co. v. United States ex rel. Rigsby*, 137 S. Ct. 436, 442 (2016)). Or put another way, "particular language in one section" but not another shows that the "disparate inclusion or exclusion" was purposeful. *Russello v. United States*, 464 U.S. 16, 23 (1983) (internal quotation omitted). So that must mean the items listed in the "Examination" subsection can justify cancellation only insofar as they coincide with the conditions listed in the cancellation subsection. The highly specific language regarding after-the-fact calculation errors appears in the former but not the latter. And so it follows that Eaton cannot seize on these errors to cancel.

The rest of the "Examination" subsection is consistent with this interpretation. The subsection goes on to say that "if the taxpayer has not satisfied any requirement in the prior paragraph," the IRS "may decide to enforce, revise (see section 10.05), cancel (see section

10.06) or revoke (see section 10.07) the APA." Rev. Proc. 2004-40, § 10.03(3).[4] The most reasonable reading of this language is that all of the items in the "Examination" subsection go toward enforcement of the APA, and some of them may also slot variously into revision, cancellation, or revocation, depending on the specific item. Or in Eaton's words, the IRS can "enforce, revise, cancel, or revoke the APA when the circumstances in § 10.03(2) *match* the circumstances identified in the more specific provisions about revision (§ 10.05), cancellation (§ 10.06), or revocation (§ 10.07)." (Second Br., pp. 52-53.)

This reading coheres with "the rule of reddendo singula singulis," the distributive canon which says that "words and provisions are referred to their appropriate objects." *Sandberg v. McDonald*, 248 U.S. 185, 204 (1918). The language here juxtaposes "cancellation" with "(§ 10.06)," Rev. Proc. 2004-40, § 10.03(3), thus reconfirming that § 10.06 (or § 11.06, in the case of Revenue Procedure 96-53) is the "appropriate object[]" for cancellation. *Sandberg*, 248 U.S. at 204.

Confronted with this distributive principle, the IRS responds that "the audit provisions emphasize that if the taxpayer fails to establish any of the requirements listed[,] . . . the IRS may decide on several alternative consequences, including deciding to cancel the APA." (Third Br., p. 26 (internal quotation omitted).) In other words, the IRS says, "[t]he word 'any' precludes an interpretation that only *some* taxpayer failings identified during an audit merit cancellation." (*Id.*) But this mischaracterizes things. All that language says is that if "any requirement" listed in the Examination section has not been "satisfied," the IRS must refer the matter to the APA Director (Revenue Procedure 2004-40) or the Associate Chief Counsel (Revenue Procedure 96-53). Rev. Proc. 2004-40, § 10.03(3); Rev. Proc. 96-53, § 11.03(3). Then, *in a separate sentence*, the Revenue Procedures list out the potential remedies (enforcement, revision, cancellation, or revocation) that the APA Director and/or Associate Chief Counsel can consider as appropriate. Rev. Proc. 2004-40, § 10.03(3); Rev. Proc. 96-53, § 11.03(3). All this is to say, the word "any" doesn't do the heavy lifting that the IRS says it does.

---

[4]This language is from Revenue Procedure 2004-40. Revenue Procedure 96-53 says basically the same thing: If "any requirement in section 11.03(2) . . . has not been satisfied," "the [IRS] will decide either to continue to apply the APA; revoke the APA (see section 11.05 of this revenue procedure); cancel the APA (see section 11.06); or revise the APA (see section 11.07)." *Id.* § 11.03(3).

In short, the grounds for cancellation do not extend beyond the four corners of the cancellation subsection. And by extension, that means they do not include errors in "the supporting data and computations" used in applying the TPM (that is, unless they otherwise coincide with the criteria listed in the cancellation subsection). Rev. Proc. 2004-40, § 10.03(2); Rev. Proc. 96-53, § 11.03(2).

*Grounds for cancellation: application.* This all means the IRS may only cancel an APA for "the failure of a critical assumption," "the taxpayer's misrepresentation, mistake as to a material fact, failure to state a material fact, failure to file a timely annual report, or lack of good faith compliance with the terms and conditions of the APA." Rev. Proc. 2004-40, § 10.06(1); *see also* Rev. Proc. 96-53, § 11.06(1). Although the IRS invoked every one of these grounds in its initial deficiency notice, its argument on appeal is narrower: Eaton's inadvertent errors and purported omissions constituted "failure to state" or "mistake as to" "material fact[s]." (First Br., p. 54 (internal quotation omitted).)

The analysis thus collapses into whether Eaton's conduct here was "material." If it wasn't, that is the end of the rope for the IRS. To define that key term, we can look to the Revenue Procedures' text: "Material facts are those that, if known by the Service, would have resulted in a significantly different APA (or no APA at all)." Rev. Proc. 96-53, § 11.06(1); *see also* Rev. Proc. 2004-40, § 10.06(1) ("[The IRS] will consider facts as material if, for example, knowledge of the facts could reasonably have resulted in an APA with significantly different terms and conditions.").[5]

---

[5]Unlike Revenue Procedure 96-53, Revenue Procedure 2004-40 tags on some materiality language relating specifically to annual reports: "In regard to annual reports, the [IRS] will consider facts as material if, for example, knowledge of the facts would have resulted in . . . a materially different allocation of income, deductions, or credits than reported in the annual report." Rev. Proc. 2004-40, § 10.06(1). To the extent this might offer a second, alternative definition of materiality, it is wholly inapplicable here. That's because the annual reports in this case contained the correct numbers. To recap, the IRS's grievance isn't that the annual reports listed inaccurate transfer prices—it's that Eaton's *tax returns* reported the wrong numbers, and the annual reports represented that those tax returns were accurate. *See supra* at 5-6. In other words, the IRS hangs its hat on "[t]he large discrepancies between the prices reported on Eaton's tax returns and the prices reported on Eaton's APA Reports." (First Br., p. 16.) So even if Eaton never made the mistakes at issue in this case, the same numbers would have ended up on the annual reports anyway. That is to say, there would not have been "a materially different allocation of income, deductions, or credits . . . reported in the annual report." Rev. Proc. 2004-40, § 10.06(1).

This echoes the prevailing contract-law definition. *See Universal Health Servs., Inc. v. United States*, 579 U.S. 176, 193 (2016) ("Under any understanding of the concept, materiality 'look[s] to the effect on the likely or actual behavior of the recipient of the alleged misrepresentation.'" (quoting 26 R. Lord, Williston on Contracts § 69:12 (4th ed. 2003))); *In re Sallee*, 286 F.3d 878, 897 (6th Cir. 2002) ("A material fact is a fact that affects the conduct of a reasonable person and is likely an inducement of the contract."); Restatement (Second) of Contracts § 162(2) (1981) ("[A] misrepresentation is material if it would be likely to induce a reasonable person to manifest his assent."). And under this definition, none of Eaton's inadvertent errors and purported omissions are material.

*First*, the IRS points to Eaton's alleged failure to disclose the APA Multiplier. The IRS's argument here fails for the simple reason that Eaton *did* in fact disclose the APA Multiplier. More specifically, after the parties finalized APA-I, the IRS audited Eaton's annual reports. The IRS sent Eaton an Information Document Request, and "[a]s part of its response[,] [Eaton] explained how the APA I multiplier was computed and applied." (R. 735, July 26, 2017 Op., p. 70.) What's more, at least one of the members of that audit team (David Votaw) went on to participate in the negotiations for APA-II. So clearly, the IRS knew about the APA Multiplier. But then it went on to execute a materially identical APA-II anyway. And neither Votaw nor anyone else raised any objections. Evidently, Eaton's use of the APA Multiplier had no effect on whether the IRS would "manifest [its] assent." Restatement (Second) of Contracts § 162(2) (1981).

In response, the IRS makes much of the fact that Eaton failed to mention the APA Multiplier in its formal application for APA-II. But this is a red herring. True, the Revenue Procedures set out certain steps that a taxpayer must follow when requesting an APA. More specifically, "[t]he taxpayer must submit copies of any documents relating to the proposed TPM" and make certain that all information submitted in its application is "properly labeled, indexed, and referenced in the request." Rev. Proc. 2004-40, § 4.01(3); Rev. Proc. 96-53, § 5.01(2). But whether Eaton followed these steps is an altogether different question from whether the IRS *knew* about the APA Multiplier as a factual matter. It apparently did, notwithstanding its efforts to hide behind procedure. Indeed, "actual knowledge . . . is very strong evidence that [the

controverted facts] are not material," and actual knowledge is what the IRS had here. *Universal Health Servs., Inc.*, 579 U.S. at 178.

It's worth noting as well that the APA Multiplier was simply "an implementation mechanism that incorporated the transfer price into [Eaton's] financial statements." (R. 735, July 26, 2017 Op., p. 93.) That is to say, it "was not used to compute or modify the transfer price determined under the APA TPM." (*Id.*) And so it's natural that the APA Multiplier didn't feature prominently in Eaton's negotiations with the IRS. After all, the whole point of the APA is "to reach agreement on a TPM," of which the APA Multiplier plays no direct part. (*Id.*, p. 152.) In any event, the IRS knew about the APA Multiplier, and it cannot disclaim that knowledge now.

*Second*, the IRS highlights Eaton's inadvertent miscalculation of the APA Multiplier. The IRS's argument on this front falls short as well. To begin with, as explained above, errors in "the supporting data and computations" do not qualify as grounds to cancel. *See supra* at 12-15. This is enough to resolve the issue. But putting that to one side, after-the-fact miscalculations like these cannot be "material" in any event. Again, "[m]aterial facts are those that, if known by the Service, would have resulted in a significantly different APA (or no APA at all)." Rev. Proc. 96-53, § 11.06(1). These errors were inadvertent—no one disputes this. Neither the IRS nor Eaton could have known, before agreeing to the TPM, that Eaton would make unintended math mistakes related to the APA Multiplier in the future. Or to put a finer point on it, future calculation errors were not "present-day fact[s]" that existed at the time of contract. (Second Br., p. 56.) And so it stands to reason that these errors could not have affected the "inducement of the contract." *In re Sallee*, 286 F.3d at 897. Perhaps a promise to never make unintentional math errors could be a "present-day fact" of sorts—or at least a present-day representation—but that was not the bargain here.**[6]**

---

**[6]**This doesn't completely foreclose the cancellation of the APAs for errors or misrepresentations that appear in documents post-dating the APAs. Consider an illustrative hypothetical. Suppose, for example, that Eaton committed to an IRS-preferred TPM to induce the IRS into an APA. A couple years after executing the APA, Eaton switches over, unilaterally, to an entirely different TPM. But it continues to represent in its annual reports that it's abiding by the bargained-for TPM. This, even though a key purpose of the annual reports is to "put[] the Service on notice if . . . material facts have changed." IRS Announcement 2000-35, 2000-1 C.B. 922, 943. In this hypothetical, there *was* a material, present-day fact or representation at the time of contract that induced the contract: Eaton's

*Third*, and last, the IRS points to Eaton's annual reports to support cancelling the APAs. The IRS claims that Eaton's reports "contained three critical representations that are invalid and constitute mistakes as to material facts." (First Br., p. 39.) It calls out Eaton's representations that it "complied with all APA terms and conditions," "its transfer pricing [as listed in its tax returns] satisfied the APAs' Berry-ratio requirement," and "its transfer pricing for the [Breaker] Products [as listed in its tax returns] required no compensating adjustments." (*Id.*, pp. 39-40 (internal quotations omitted).) But the problem for the IRS is this: These representations overlap entirely with Eaton's inadvertent miscalculations. The IRS simply recasts the same grievance under a new label. Put another way, these representations happened because of, and *only* because of, Eaton's calculation mistakes. This is unlike, say, an intentional omission in an annual report.

And that means the annual reports argument rises and falls with its math error argument. Because the latter misses the mark, so does the former. To convince us otherwise, the IRS must offer some sort of delta between the calculation errors and its annual reports. The IRS tries to make that distinction by claiming that Eaton's representations in the reports go towards a "failure to actually verify whether its tax reporting complied with the APAs." (Third Br., p. 12.) But that sounds exactly like ensuring the "correctness of the supporting data and computations used to apply the TPM," which of course falls into enforcement, not cancellation. Rev. Proc. 2004-40, § 10.03(2); *see also* Rev. Proc. 96-53, § 11.03(2).

And thus, for all of these reasons, the IRS cannot carry its burden. It was never entitled to cancel its bargain.

---

commitment to the TPM. And thus, Eaton's post-contract omissions in the annual reports may well be fair game for cancellation, since they tie back to the inducement of the contract.

*This* is how we must interpret those limited parts of the Revenue Procedures that connect "material" omissions or representations with "subsequent submissions (including the annual report)." Rev. Proc. 96-53, § 11.06(1); *see also id.* § 11.03(2) (referring to "material representations in the APA and the annual reports"); Rev. Proc. 2004-40, § 10.03(2) (referring to the "validity and accuracy of the annual report's material representations"). The IRS's responses to Eaton's "present-day fact" argument miss this nuance entirely, and so they fall short.

## C.  26 U.S.C. § 6662 Penalties

The penalty question comes with a convoluted posture, and thus some housekeeping is necessary to set the scene.  Eighteen months after trial, the IRS claimed 40 percent penalties under 26 U.S.C. § 6662(h).  This occurred after the Tax Court issued its principal opinion (finding that the IRS wrongfully cancelled the APAs) and directed the parties to submit follow-up computations under Tax Court Rule 155.  Section 6662(h) allows the IRS to impose penalties for "gross valuation misstatements."  The IRS based these 40 percent penalties on Eaton's self-corrections of its multiplier miscalculations.  Importantly, this latest claim was different from the penalties claim that the IRS advanced *before* trial.

Before trial, the IRS sought to assess § 6662(h) penalties based on adjustments that *it* made using *its own* calculation method that is nowhere to be found in the APAs (because these adjustments were made assuming the APAs were cancelled).  More precisely, the IRS failed to use a CUP method—the central feature of the TPM's first step.  And on top of this, it deployed a CPM that tested the *Island Plants*' profits against those of comparable companies.  By way of contrast, the TPM's CPM tests *Eaton*'s profits, not the Island Plants'.  But after trial, the IRS went with an altogether different approach: It pegged its penalties to Eaton's self-corrections.  And those self-corrections, of course, were based on the TPM.  In other words, the specific adjustments that formed the basis of the IRS's penalties claim before trial were different from those that supported its post-trial assessment.

In response to the IRS's post-trial penalties claim, Eaton argued three things.  First, the IRS forfeited the claim by failing to raise it at or before trial.  Second, the IRS failed to get written approval for the assessment as required by 26 U.S.C. § 6751(b).  And third, Eaton's corrections could not trigger penalties because they did not constitute § 482 adjustments as a threshold matter.  The district court avoided the first two arguments. Instead, it resolved the issue in Eaton's favor by "conclud[ing] that there were no net section 482 adjustments to support imposition of section 6662(h) penalties."  (R. 807, Oct. 28, 2019 Order, p. 9.)

On appeal, Eaton says the Tax Court got the outcome right but the reasoning wrong.  It now concedes that its self-corrections were § 482 adjustments after all.  Eaton seeks an

affirmance, but on the forfeiture and written approval grounds, *not* § 482.  And thus, we have before us three questions.  Were the corrections § 482 adjustments?  If so, did the IRS forfeit its new penalties claim?  And if it didn't forfeit the claim, did the IRS obtain the necessary written approval?  We answer the first two questions in the affirmative, and so we need not reach the third.  As such, we affirm on the penalties question, but without adopting the Tax Court's reasoning.  *See Warda v. Comm'r*, 15 F.3d 533, 539 n.6 (6th Cir. 1994) ("[A]n appellate court may affirm on any ground supported by the record, even though the ground relied on by the lower court was different from the one chosen by the appellate panel.").

*Section 482.*  The threshold question is whether Eaton's self-corrections count as § 482 adjustments.  They plainly do.  Treasury Regulation § 1.6662-6(c)(1) defines "net section 482 adjustment" as "the sum of all increases in the taxable income of a taxpayer for a taxable year resulting from allocations under section 482" minus "collateral adjustments."  Section 482, of course, is what gives the IRS the power to compel transfer-price adjustments in the first place, which is what this case is all about.  In ruling otherwise, the Tax Court offered only a perfunctory explanation:  Eaton's self-corrections could not constitute § 482 adjustments because they were made under APAs that remained in effect.  (R. 807, Oct. 28, 2019 Order, pp. 11-12 (holding that because "the APAs remained in effect," "[t]here was no allocation of income and deductions by the Secretary pursuant to section 482").)

But the Tax Court never explained why that distinction matters.  Nor did it cite any authorities to that end.  In fact, the APAs themselves confirm they are extensions of the IRS's allocation authority under § 482.  Each says it "contains the Parties' agreement on the best method for determining arm's-length prices of the Covered Transactions *under I.R.C. section 482*."  (R. 41, APA-I, p. 2 (emphasis added); R. 41, APA-II, p.1 (emphasis added).)  Section 482 has one function: to allow the IRS to "distribute, apportion, or allocate gross income, deductions, credits, or allowances . . . if [it] determines that such distribution, apportionment, or allocation is necessary in order to prevent evasion of taxes."  26 U.S.C. § 482.  The IRS used the APAs to effectuate this allocation authority, and Eaton's corrections were based on those same APAs.  It stands to reason that the corrections were § 482 adjustments, which means the analysis reaches the forfeiture inquiry.

*Forfeiture*. The Tax Court may impose penalties (or any other "additions to the tax") only "if [a] claim therefor is asserted . . . at or before the hearing or a rehearing." 26 U.S.C. § 6214(a); *see also* T.C. R. 155(c) ("Any argument . . . will be confined strictly to consideration of the correct computation of the amount to be included in the decision resulting from the findings and conclusions made by the Court, and no argument will be heard upon or consideration given to . . . any new issues."). The specific disagreement here is whether the IRS's post-trial penalties claim is different from its pre-trial penalties claim. Eaton says yes; the IRS says no.

How, then, is a court to determine if the post-trial penalties claim is the same or not? The answer is a fairly straightforward one: If the penalty doesn't cover the same adjustments, it's a different penalty. After all, the same statute that authorizes these penalties makes clear that each penalty pegs to specific "portion[s] of the [taxpayer's] underpayment." 26 U.S.C. § 6662(h)(1). And indeed, the IRS directs its own examiners to "identify the adjustments related to each penalty" and "identify each penalty separately by name, IRC section, and penalty computation." IRM 20.1.5.4(4) (Aug. 31, 2021). Each adjustment corrects a different "underpayment," and those underpayments are what give rise to specific penalties. *See* 26 U.S.C. § 6662(h)(1). Or to put a different spin on it, if the assessment "requires the presentation of different evidence," it's a new and different penalty. *Sanderling, Inc. v. Comm'r*, 66 T.C. 743, 758 (1976). When the penalties turn on *different* adjustments for *different* underpayment amounts yielded from a *different* method, it stands to reason that the analysis falls into this rule's ambit.

In response, the IRS attempts a semantic maneuver. It claims that "there is only one adjustment at issue—Eaton's erroneous pricing of the Products." (Third Br., p. 44 n.14.) And thus, the argument goes, the IRS "asserted penalties on the adjustment at issue" well before trial. (*Id.*, p. 44.) But the IRS conflates the *fact of an error* with the *specific adjustments* (and underpayments) that form the basis of its penalties claim. Or put another way, the IRS asks us to forget that it advanced one set of calculations before trial and an entirely different set after trial. But the IRS can't do that—its changeup clearly implicates "the presentation of different evidence." *Sanderling, Inc.*, 66 T.C. at 758. Under the IRS's proposed rule, the government is free to mix and match an infinite number of theories—before trial, after trial, and anywhere in

between—so long as everyone agrees that Eaton made *some* sort of error in its transfer pricing for 2005 and 2006. That is a bridge too far.

In fact, the IRS explicitly rejected Eaton's APA-based self-corrections at first. It did this by rejecting Eaton's amended tax returns, which were calculated using the TPM. Instead, the IRS continued to insist on its own, non-APA method. That is, of course, until after trial. And now, the IRS must take the bitter with the sweet. It cannot reject Eaton's adjustment method before trial, but then claim after trial that it was arguing the same thing all along.

In short, the adjustments that give rise to the IRS's post-trial penalties claim were "neither placed in issue by the pleadings, addressed as an issue at trial, nor discussed by [the Tax Court] in its prior opinion." *Molasky v. Comm'r*, 91 T.C. 683, 686 (1988). And that means the IRS forfeited the claim.

### D. Double Taxation Relief

The final issue—double taxation relief—is more cut and dry. In fact, both parties now agree that Eaton is entitled to relief from double taxation under Revenue Procedure 99-32.

Revenue Procedure 99-32 addresses a unique double tax issue that arises in the § 482 context. To review, Eaton's corrections inflated its U.S. income and—by extension—its income tax liability. The problem is that Eaton's overseas subsidiaries still had that extra cash in their hands afterwards. And when the subsidiaries repatriated that cash, Eaton found itself subject again to increased income tax liability. *See* Rev. Proc. 99-32, § 2. Revenue Procedure 99-32 solves that problem by treating the original overpayment as "a loan or advance." *Id.* § 4.01(2). And that means the repatriation of the excess cash functions simply as a repayment of a loan, not taxable income.

The Tax Court denied relief here because Revenue Procedure 99-32 applies to § 482 adjustments only. Because the Tax Court held that Eaton's self-corrections didn't constitute § 482 adjustments, Revenue Procedure 99-32 could not apply. But of course, Eaton's corrections *were* § 482 adjustments after all. *See supra* at 20. With that cleared up, nothing stands between Eaton and double taxation relief under Revenue Procedure 99-32.

The only thing left to clarify are procedural next steps.  Section 5 of Revenue Procedure 99-32 sets out various "procedures to be followed."  Different procedures apply, depending on how the § 482 adjustments are raised.  The IRS says the procedures laid out in § 5.04 should apply, because "[t]his case is now within the jurisdiction of the Department of Justice."  (Third Br., p. 65.)  Eaton does not object to this, and it offers no argument in opposition.  And thus, consistent with § 5.04, we remand to the Tax Court so that the IRS can "enter into a stipulation with Eaton regarding conforming adjustments."  (Third Br., p. 65.)  *See also* Rev. Proc. 99-32, § 5.04 ("[T]he Service . . . will recommend to the Department of Justice the action to be taken with respect to the taxpayer's request.").

## IV.

For these reasons, we affirm in part and reverse in part.